[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11546

_____

D.C. Docket No. 2:13-cv-00132-MHH

GREG TOLAR,
REID TOLAR,
ANDREW TOLAR,

Plaintiffs - Appellants,

versus

BRADLEY ARANT BOULT COMMINGS, LLP,
MARION BANK AND TRUST,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 17, 2021)

Before GRANT, MARCUS, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiffs appeal the district court's order dismissing their Title VII

retaliation claims against Defendant Bradley Arant Boult Cummings, LLP

("Bradley Arant") and granting summary judgment to Defendant Marion Bank and Trust ("Marion Bank") on these Title VII retaliation claims.  After a careful review of the record, and with the benefit of oral argument, we affirm.

## BACKGROUND

### I.    Facts

Defendant Marion Bank is a financial institution located in Marion, Alabama.  Defendant Bradley Arant is an Alabama law firm that has represented Marion Bank in litigation related to this case.  Plaintiffs Greg, Reid, and Andrew Tolar are the father, brother, and uncle (respectively) of Ragan Youngblood,[1] a former employee of Marion Bank who was hired in February 2008 and fired seven months later, in September 2008.  During her employment with Marion Bank, Ragan served as the personal assistant to the Bank's president and CEO, Conrad Taylor.  After she was fired, Ragan filed an EEOC charge alleging that Taylor had sexually harassed her and retaliated against her for complaining about that harassment. Plaintiffs claim the Bank and its counsel Bradley Arant took adverse action against them in retaliation for Ragan's protected conduct.

### A.    Greg Tolar's Prior Relationship with Marion Bank

---

[1]  Ragan Youngblood is sometimes referred to in the record by her former married name, Ragan Livingston.

2

Ragan's father, Greg Tolar, is an attorney who practices law in Alabama. Greg[2] began handling some loan closings for Marion Bank in 2005, and he relocated his law practice to Marion that same year. By the time Ragan started working for the Bank in 2008, the Bank was paying Greg approximately $3,500 a month in legal fees related to closings and collections work.

In addition to his working relationship with the Bank, Greg was the debtor on two outstanding loans. Specifically, on February 1, 2008, before Ragan was hired, Marion Bank refinanced a $100,000 unsecured line of credit that Greg had with Regions Bank. Per the refinancing agreement, Greg's loan with Marion Bank matured on January 31, 2009. On March 8, 2008, a month after Ragan was hired, Greg co-signed a separate, approximately $25,000 commercial loan that Marion Bank made to Ragan's then-husband, Mitchell Livingston, who needed the money to open a restaurant. This $25,000 commercial loan was secured by two vehicles owned by the Livingstons.

## B.    Ragan's Claims of Sexual Harassment and Retaliation

Marion Bank hired Greg's daughter Ragan in February 2008, and it fired her seven months later, in September 2008. Ragan claims the Bank's president and her

---

[2]  To avoid confusion, we refer to each Tolar family member by his or her first name.

3

direct supervisor, Conrad Taylor, sexually harassed her while she worked for the Bank.  According to Ragan, Taylor convinced the Bank to fire her when she threatened to report his conduct.

In late September 2008, a few days after Ragan was fired, her father Greg met with Marion Bank's board chairman, Randy Richardson.  During the meeting, Greg informed Richardson about Ragan's sexual harassment claim, and he asked Richardson to rescind Ragan's termination, investigate the claim, and keep Ragan on administrative leave with her insurance in effect while the investigation was pending.  Greg testified in the present litigation that during the September 2008 meeting he also advised Richardson that "an EEOC charge would be forthcoming" regarding Ragan's sexual harassment claim. When he was deposed in Ragan's underlying Title VII suit, Greg testified more specifically that he told Richardson during the meeting that "we would be filing an EEOC charge on [Ragan's] behalf." (emphasis added).  Ragan likewise testified in an affidavit she submitted in her underlying suit that Greg met with Richardson in September 2008 "as [her] attorney."  At the end of the meeting, Richardson asked Greg about the status of his pending legal work for the Bank, and Greg told Richardson he was in the process of completing three foreclosures.

The next day, Richardson informed Greg that the Bank believed Taylor's version of the events underlying Ragan's sexual harassment claim and that the

4

Bank would not be investigating further. Richardson instructed Greg to complete the pending foreclosures, with Bank vice-president Preston Nichols acting as Greg's contact for the work. Greg completed the pending foreclosures in early October 2008. Shortly thereafter, the Bank's board approved a list of attorneys authorized to conduct legal work on behalf of the Bank, which list excluded Greg. The Bank did not refer any new legal work to Greg after his September 2008 meeting with Richardson. Nichols testified that the Bank stopped referring legal work to Greg because its officers believed Greg had become "adversarial to [the Bank] in another lawsuit" (Ragan's sexual harassment claim), among other issues.

On October 9, 2008, Ragan filed a handwritten EEOC charge against Marion Bank alleging sexual harassment and retaliation in violation of Title VII. Ragan subsequently submitted a typed version of her charge at the EEOC's request. Although Greg's name did not appear as counsel on either charge, Greg sent the EEOC a letter in November 2008 advising the agency that he represented Ragan "as her legal counsel as well as being her father" and that any future correspondence should be directed to him.

In 2011, Ragan filed a Title VII suit against Marion Bank and Conrad Taylor. Bradley Arant represented the Bank in the Title VII action. Greg did not represent Ragan.

### C.    Greg Tolar's Loan Defaults

After Ragan's termination from employment, her husband defaulted on the $25,000 loan from the Bank he had obtained to fund his business start-up, and Greg failed to satisfy his obligation as co-signor to pay the debt.  Thereafter, Greg failed to repay his $100,000 refinanced loan with Marion Bank by its January 31, 2009 maturity date, and ultimately defaulted on that loan as well.  Plaintiffs claim the Bank caused both defaults because its decision to stop referring legal work to Greg cut off a primary source of Greg's income and prevented him from financially supporting Ragan and her husband.

Whatever the explanation, both defaults ultimately resulted in litigation. With respect to the $25,000 loan, the Bank repossessed the vehicles that were pledged as security for the loan and sold them at auction.  The Bank applied the proceeds of the sale—about $1,750—to the loan, and then filed an action in Alabama circuit court in July 2009 against Greg and Ragan's husband, Mitchell, to recover the remaining loan balance.  In September 2010, the court entered judgment in the Bank's favor and ordered Ragan's husband and Greg to pay $28,687 in principal and interest, plus $4,303 in attorney's fees.

As to Greg's defaulted $100,000 line-of-credit loan, the Bank agreed in March 2009 to extend the maturity date of the debt for another year—to January 30, 2010—in exchange for Greg's partial payment of interest.  As it was outside

6

Bank policy to extend a loan based on a promise to pay only a partial payment of interest, the Bank loan committee had to approve this extension. When Greg failed to pay the debt by the renegotiated, extended maturity date, the Bank tried unsuccessfully to reach him by telephone. The Bank then emailed Greg and inquired about his plans for repayment; Greg's only response was an email stating that he had gotten the Bank's email. Accordingly, the Bank filed an action in Alabama circuit court in March 2010 on this debt. The Bank obtained a judgment against Greg in this second action for $116,880 in principal and interest, plus $11,688 in attorney's fees, which judgment, along with the judgment on the $25,000 debt, also issued in September 2010.

After obtaining the judgments against Greg, the Bank pursued garnishment against his wages. The Alabama circuit court issued a garnishment against Greg, naming his law firm as the garnishee. Greg responded to the garnishment by advising the court that he had dissolved the law firm. In post-judgment interrogatories submitted in December 2010, Greg stated that he had no assets to pay the Bank's judgments against him.

### D.    The Tolar Family Trust

Prior to the loan defaults, Greg, along with his brother Andrew Tolar, was a trustee and income beneficiary of what was purportedly an irrevocable trust formed

by their father, James Tolar.  The trust agreement provided that the trust income would be available to and under the sole direction of James Tolar's wife, Martha Tolar, for as long as she lived.  Upon Martha's death, the trust income was to be distributed to Greg, Andrew, and two of James Tolar's other children.  The agreement contained a spendthrift provision stating that the interest of any beneficiary in the trust was not subject to "assignment, alienation, pledge, attachment, or claims of creditors" and that it "shall not otherwise be voluntarily or involuntarily alienated or encumbered by such beneficiary."  The agreement provided that the trust would remain in full force and effect until all of James Tolar's children are deceased "at which time it will terminate" and the entire corpus of the trust will be "divided and distributed" equally among James Tolar's grandchildren.

In February 2010, which was several months after the Bank began collection proceedings on the $25,000 loan and within a month of Greg's default on the renegotiated $100,000 loan, Greg, as trustee, executed an addendum to the Tolar Family Trust.  The addendum made several changes, the most relevant one being the removal of him as a beneficiary of the trust.  Specifically, the changes executed by Greg included:  (1) designating Greg's son, Reid Tolar, as a successor trustee, (2) deleting all references to Greg and Martha Tolar as beneficiaries and replacing their names with the names of James Tolar, Andrew Tolar, Reid Tolar, and Dean

8

Tolar, and (3) dividing the corpus of the trust among James, Andrew, Reid, and Dean Tolar in shares of approximately 20-25% each.

### E.    Actions Against the Tolar Family Trust

Following its unsuccessful efforts in late 2010-early 2011 to garnish Greg's wages, the Bank's collection efforts had remained dormant. That changed after Greg's father, the trust grantor James Tolar, died on December 25, 2011. Shortly thereafter, in January of 2012, Mike Tolar mailed the Bank a copy of the original trust and the addendum. It appeared to Bank vice-president Nichols, who was overseeing the collection efforts, that "Greg was attempting to shift his interest in the trust to Reid." Accordingly, the Bank "sought the advice of counsel to see if that [the trust] was an avenue which we could pursue to collect our judgment," retaining a bankruptcy partner at Bradley Arant to investigate any collection options that might arise from the trust. Bradley Arant had not previously represented the Bank in the earlier two collections actions.

On February 8, 2012, Bradley Arant filed a notice of appearance as additional counsel in the 2010 collection actions then pending against Greg in the Alabama circuit court, which notice was served on Greg. As noted *supra,* post-judgment discovery had already taken place by that time, and, in response to interrogatories, Greg had stated that he had no assets. On the next day after Bradley Arant's appearance, Greg contacted Bradley Arant counsel to inquire

whether the matter could be settled via monthly payments for an unspecified amount. A few days thereafter, counsel emailed Greg, inviting him to make a specific proposal.

On February 10, 2012, on the advice and with the assistance of Bradley Arant, the Bank filed a complaint against the Tolar Family Trust in Alabama circuit court, asserting a claim against the trust under the Alabama Fraudulent Transfer Act (referred to interchangeably as "AUFTA" or "the fraudulent transfer action"). The Bank alleged in the AUFTA complaint that Greg had restructured the trust and assigned his beneficial interest to his son, Reid, to frustrate the Bank's ability to collect its outstanding judgments. The complaint named Reid as an individual defendant, and it named Greg and Andrew as defendants in their roles as trustees. In the complaint, the Bank sought a temporary restraining order ("TRO") prohibiting the distribution of any proceeds attributable to Greg's former beneficial interest in the trust.

On March 5, 2012, the Alabama circuit court entered the TRO requested by the Bank, and it enjoined the family trust from making distributions to Greg or his son, Reid. Thereafter, in March 2012, Greg emailed the Bradley Arant counsel offering to settle the judgments now totaling approximately $170,000 for only $40,000. Counsel responded that the Bank was not in a position to settle for such a discount or to make a counteroffer without first conducting some discovery.

10

When the Bank filed the AUFTA complaint, Reid was a third-year law student preparing to sit for the Alabama bar exam.  Because he was named as a defendant in the action, Reid had to report the lawsuit to the state bar's character and fitness committee.  Although the committee allowed Reid to sit for the bar exam after conducting a fitness hearing, he claims that he was injured by being named in the action.

### F.    Greg Tolar's Bankruptcy Petition

In April 2012, which was shortly after the Bank had filed the AUFTA suit and after the state court had temporarily enjoined distributions from the family trust to Greg or his son, Reid, Greg filed for Chapter 13 bankruptcy.  Before he filed the petition, Greg advised the bankruptcy trustee that his Chapter 13 plan would provide for 100% repayment of his debt to Marion Bank.  After Greg filed for bankruptcy, Bradley Arant informed the trustee of the AUFTA complaint pending in state court.  Although Plaintiffs assert that this contact was irregular, Bradley Arant claims that, as a creditor's counsel, it routinely apprises the bankruptcy trustee of any relevant pending litigation.

In May 2012, Greg filed his Chapter 13 plan, which proposed to pay 100% of the Bank's judgments over a period of 54 months.  The Bank objected to Greg's plan on two grounds:  (1) it accused Greg of not filing the petition in good faith, but rather as an evasive tactic to avoid paying his debts and (2) it argued that the

11

plan did not account for the lost-time value of money. The Bank claimed in its objection that Greg was a current income beneficiary of the Tolar Family Trust with access to trust funds that could satisfy his debts to the Bank. According to Plaintiffs, this claim was false because Greg was not entitled to any trust income while Martha Tolar was alive, any interest Greg had in the trust was not accessible to creditors pursuant to the trust's spendthrift clause, and Greg was not entitled to any distribution of trust funds pursuant to the 2010 addendum.

In August 2012, Greg filed an adversary proceeding in the bankruptcy court alleging that the Bank had violated the automatic stay provisions of the bankruptcy code by failing to release the TRO in the AUFTA litigation pending in the Alabama circuit court. Shortly thereafter, the Bank moved for a TRO and a preliminary injunction in the bankruptcy court seeking to enjoin any distributions from the Tolar Family Trust attributable to Greg or Reid's beneficial interest. The bankruptcy court granted the Bank's motion and preliminarily enjoined the trust from making distributions to Greg, Reid, or any other person for their benefit.

### G.    Settlement of Greg's Debts to Marion Bank

The parties ultimately settled the collection actions (including the AUFTA claim) and the bankruptcy litigation in the fall of 2012. Pursuant to the settlement agreement, the bankruptcy court dismissed Greg's Chapter 13 petition and Reid

consented to the withdrawal of $170,000 from his interest in the Tolar Family Trust to satisfy the two judgments against Greg.  In December 2012, the parties filed a joint stipulation of dismissal of the Bank's AUFTA claim.  Prior to settlement, in June 2012, Greg had filed a charge with the EEOC alleging that the Bank had engaged in third-party retaliation against his daughter, via the actions the Bank had taken against Greg.

## II.    Procedural History

In January 2013, Plaintiffs filed this lawsuit asserting third-party Title VII retaliation claims against Marion Bank and the law firm representing it, Bradley Arant.[3]  In support of their claims, Plaintiffs allege that the Bank and Bradley Arant took adverse action against them in order to punish the Bank's former employee, Ragan, for pursuing her Title VII sexual harassment claim.  The adverse actions alleged were (1) the collection-related litigation initiated by Bradley Arant on behalf of the Bank to collect the moneys for which two judgments against Greg had earlier been issued and (2) the Bank's refusal to continue referring legal work to Greg.

The district court dismissed Plaintiffs' retaliation claims against Bradley Arant pursuant to Federal Rule 12(b)(6).  The court concluded that Bradley Arant

---

[3]  Plaintiffs also asserted various state law claims against Defendants and state and Title VII claims against Taylor, but Plaintiffs do not appeal the district court's ruling dismissing those claims.

could not be liable to Plaintiffs for retaliation under Title VII because neither Plaintiffs nor Ragan had an employment relationship with Bradley Arant. Plaintiffs appeal this ruling.

Following discovery, the district court granted the Bank's motion for summary judgment on Plaintiffs' remaining retaliation claims. The court concluded that Plaintiffs were "persons aggrieved" within the meaning of Title VII—and thus had standing to pursue a third-party retaliation claim under that statute—and that Ragan had engaged in statutorily protected activity. However, the court determined that Plaintiffs could not establish the necessary causal link between Ragan's protected activity and any adverse action the Bank took against Plaintiffs. Plaintiffs appeal the court's summary judgment ruling as to their claims against Marion Bank. Albeit we do not necessarily endorse the district court's reasoning that Plaintiffs could be considered to be persons aggrieved, for purposes of third-party status, we will assume that to be so. And we affirm the district court's ruling that summary judgment was properly granted based on the application of the *McDonnell Douglas* standard.

## DISCUSSION

I.    **Plaintiffs' Retaliation Claims Against Marion Bank**

A.    **Standard of Review**

14

We review the district court's summary judgment ruling in favor of Marion Bank de novo, construing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). Applying that standard, summary judgment is appropriate if the Bank shows that there are no genuine issues of material fact and that the Bank "is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a) (internal quotation marks omitted)).

### B.    Legal Framework Governing Third-Party Retaliation Claims Under Title VII

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . under [Title VII]." 42 U.S.C. § 2000e-3(a). A Title VII retaliation claim based on circumstantial evidence, like the claim asserted by Plaintiffs here, is ordinarily analyzed under the *McDonnell Douglas* burden-shifting framework. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020). Pursuant to that framework, the plaintiff first must establish a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected conduct—that is, conduct protected by Title VII; (2) she suffered an adverse action; and (3) "there is some causal relationship between the two events." *Id.* (internal quotation marks omitted). The burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse action. *Id.* Assuming

15

the employer's burden is met, "the burden shifts back to the plaintiff to establish that the reason offered by the [employer] was not the real basis for the decision, but a pretext" for retaliation. *Id.* (internal quotation marks omitted).

The wrinkle in this case is that Plaintiffs, who were not employees of the Bank, concede that they are not claiming that the Bank retaliated against them because they engaged in protected activity under Title VII. Instead, basing their claims on the protected conduct of a non-party employee of the Bank—their relative, Ragan Youngblood—Plaintiffs argue that the Bank's actions toward Plaintiffs were done to retaliate against Ragan for having engaged in her own protected conduct. Specifically, Plaintiffs assert that Ragan engaged in protected conduct when she complained about sexual harassment and filed an EEOC charge against her employer, Marion Bank, and that the Bank retaliated against Ragan by taking the adverse actions identified above against Plaintiffs. In other words, Plaintiffs assert claims for third-party retaliation in violation of Title VII.

The Supreme Court has held that Title VII can support a viable claim for third-party retaliation under some circumstances. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174–75 (2011). The defendant-employer in *Thompson* fired the plaintiff three weeks after it received notice that the plaintiff's fiancée, who also was employed by the defendant, had filed an EEOC sex discrimination charge. *See id.* at 172. The plaintiff responded with his own Title

16

VII suit, alleging that he was fired in retaliation for his fiancée's EEOC charge. *See id.* The district court granted summary judgment to the defendant employer, and the Sixth Circuit affirmed on the ground that Title VII "does not permit third party retaliation claims." *Id.* (internal quotation marks omitted).

The Supreme Court reversed, holding that: (1) firing the plaintiff to retaliate against his fiancée violated Title VII's antiretaliation provision and (2) the plaintiff could assert a claim for relief under Title VII because he satisfied the statutory definition of a "person claiming to be aggrieved" by the alleged retaliation. *See id.* at 173–78 (citing 42 U.S.C. § 2000e–5(f)(1) (internal quotation marks omitted)). Title VII provides such an "aggrieved" person with the right to bring a "civil action" to recover for a violation of the statute. *See* 42 U.S.C. § 2000e–5(f)(1).

As to the first issue, the Court in *Thompson* had "little difficulty" concluding that the plaintiff's firing in retaliation for his fiancée's protected conduct violated Title VII. *See Thompson*, 562 U.S. at 173. The Court noted that, as it had held in *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006), the requisite adverse action for purposes of a Title VII retaliation claim does not necessarily have to be a negative action relating to the terms and conditions of employment. Instead, the Court in *Burlington* interpreted Title VII's antiretaliation provision more broadly to prohibit "any employer action that well might have dissuaded a reasonable worker from making or supporting a charge of

17

discrimination." *Thompson*, 562 U.S. at 173–74 (internal quotation marks omitted). The *Thompson* Court found it "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Id.* at 174. The Court, however, declined to set out a more specific rule as to what other types of relationships or adverse actions might provide fodder for a viable claim of third-party reprisals in violation of Title VII's antiretaliation provision, explaining:

> We expect that firing a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so, but beyond that we are reluctant to generalize.

*Id.* at 175.

As to the second issue—whether the plaintiff-fiancé could properly be considered a "person aggrieved" and therefore a person eligible to bring a retaliation action against the employer—the Court acknowledged that this question was "more difficult." *Id.* Again, Title VII provides that "a civil action may be brought . . . by the person claiming to be aggrieved" by its violation. 42 U.S.C. § 2000e–5(f)(1). The Court noted that the "person aggrieved" language could be interpreted to confer a right to sue on anyone with Article III standing—that is, anyone who suffered an "injury in fact" as a result of unlawful retaliation, which injury was "remediable by the court." *See Thompson*, 562 U.S. at 175–76. At the

18

other extreme, the "person aggrieved" language could be interpreted to limit the right to sue to the employee who engaged in the protected conduct. *See id.* at 177.

The Court in *Thompson* ultimately opted for a middle ground, holding that the term "aggrieved" as used in Title VII incorporates a zone-of-interests analysis that confers a right to sue on a plaintiff who "falls within the 'zone of interests' sought to be protected" by Title VII, but excludes a plaintiff "who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII." *Id.* at 177–78. The Court concluded that the plaintiff in *Thompson* satisfied this zone-of-interests test, explaining:

> [The plaintiff] was an employee of [the defendant], and the purpose of Title VII is to protect employees from their employers' unlawful actions. Moreover, accepting the facts as alleged, [the plaintiff] is not an accidental victim of the retaliation—collateral damage, so to speak, of the employer's unlawful act. To the contrary, injuring him was the employer's intended means of harming [his fiancée]. Hurting him was the unlawful act by which the employer punished her.

*Id.* at 178.

Pursuant to *Thompson* then, Plaintiffs must meet two prerequisites to even get out of the starting gate on a third-party Title VII retaliation claim against Marion Bank: they must show that (1) the Bank's adverse actions against them constitute actionable retaliation because those actions "well might have dissuaded a reasonable worker" (Ragan) from engaging in conduct protected by Title VII and (2) Plaintiffs qualify as "persons aggrieved" under Title VII because they fall

19

within the zone of interests protected by the statute.  *See id.* at 174, 177–78

(quoting *Burlington*, 548 U.S. at 68).

> ### C.    Retaliation Claim Based on Litigation Filed By Bradley Arant on the Bank's Behalf

> #### 1.    The Claim

As set out in their complaint, Plaintiffs assert that, in order to retaliate

against Ragan, the Bank, assisted by counsel Bradley Arant, engaged in "scorched

earth" litigation tactics in an effort to collect on judgments issued seventeen

months before against Greg.  As to just what those tactics were, Plaintiffs assert

that the only issue left to be resolved at the time the Bank retained Bradley Arant

was Greg "satisfying the judgment"; that is, collecting on the existing judgments.

Yet, according to Plaintiffs, the Bank, through Bradley Arant, rebuffed Greg's

attempt to "immediately resolve the judgment."  Instead, Plaintiffs complain,

"[r]ather than respond to Greg Tolar's attempts and offer," the Bank, through its

counsel, filed a lawsuit accusing Greg and his son of a fraudulent transfer in

connection with the family's trust in order "to hinder the Bank's ability to collect

on the judgment against Greg Tolar."  This lawsuit, according to Plaintiffs, was

"unnecessarily file[d]**."**

Plaintiffs claim that "[b]y refusing to cooperate with Greg Tolar to settle the

debt or provide pay-off information," the Bank and Bradley Arant "further harmed

Greg Tolar's financial position as an attorney to the point that he was forced to

seek protection through Chapter 13 Bankruptcy to protect his business." Then, instead of acceding to Greg's proposal as to how he should be allowed to pay off his debt, the Bank, through Bradley Arant, filed a lengthy objection to the plan in the bankruptcy court and obtained from that court a TRO to freeze an amount in the family trust account larger than the amount the Bank ultimately cited in its proof of claims. Once the Bank filed its formal proof of claims, correcting its earlier incorrect calculation of interest and deleting the calculation for attorney's fees, Greg then arranged to pay off the debt he owed the Bank and the bankruptcy petition was dismissed. According to Plaintiffs, the Bank's litigation tactics "unnecessarily drag[ged] out [Greg's] ability to seek bankruptcy relief through the courts."

Condensing the above assertions, all three plaintiffs—Greg, Reid, and Andrew—complain about the Bank's filing of the AUFTA fraudulent transfer action in state court and its filing of a TRO in the bankruptcy court to temporarily enjoin the disbursement of funds attributable to Greg's beneficial interest in the family's trust pending resolution of the dispute between the parties. Greg also complains that the Bank unnecessarily dragged out the bankruptcy proceeding by filing lengthy objections to Greg's bankruptcy plan to repay his debt to the Bank within fifty-four months.

2.      Viability, as a General Matter, of a Retaliation Claim Based on Adverse Litigation

Plaintiffs argue that the Bank engaged in "scorched earth" litigation against Plaintiffs to collect the money due the Bank on judgments it had earlier obtained against Greg Tolar. Plaintiffs further contend that the Bank engaged in these aggressive tactics because it wanted to retaliate against a relative of the Plaintiffs, which relative had engaged in protected conduct under Title VII when she claimed to be the victim of sexual harassment by a Bank official. In addressing this claim, the first question one might ask is whether the filing of a purportedly legitimate lawsuit—or motion in a lawsuit—can itself subject the initiator of that action to suit by the person he sued, on the ground that the initiator's motive for filing the pleading in question was itself impure. One might wonder why, if the defendant has a valid cause of action against the plaintiff, he should not be permitted to sue—utilizing all tools available to effectuate that suit—regardless of the motivation prompting the decision to sue. After all, it is presumably the rare lawsuit that is brought with warm-hearted notions in mind.

In addition, plumbing the complex set of considerations that likely accompany any decision to initiate litigation is a very uncertain task, requiring an examination of not just subjective motivations, but also objective legal assessments. As the Supreme Court has noted in the context of a § 1983 First Amendment retaliatory arrest claim: the allegation of retaliatory animus by a

22

governmental entity is "easy to allege and hard to disprove." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (internal quotation marks omitted).  Indeed, this Court has recently held that "the presence of probable cause will generally defeat a . . . § 1983 First Amendment retaliation claim based on a civil lawsuit as a matter of law." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304 (11th Cir. 2019). *DeMartini* explained that "[P]robable cause to initiate [a civil lawsuit] requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id*. at 1300–01 (alterations accepted and internal quotation marks omitted) (*quoting Pro. Real Est. Invs.*, *Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62–63 (1993)).

We have not considered whether the existence of probable cause would likewise defeat a Title VII retaliation claim that is founded on the filing of a civil lawsuit.[4]  If, however, the existence of probable cause for the Bank's AUFTA action and for its objections to Greg's bankruptcy plan meant the death knell for this type of claim, the claim might well sink on just that preliminary element. After all, the Bank achieved the relief requested by the AUFTA claim, as two courts granted the Bank a TRO enjoining a distribution of any money in the trust

---

[4]  We have applied a similar rule in the ADA context, albeit in an unpublished—and hence non-precedential—case.  *See Smith v. Miami-Dade Cnty.*, 621 F. App'x 955, 960 (11th Cir. 2015) (explaining that, in order to prevail on a retaliatory-litigation claim under the ADA, the plaintiff must allege that litigation "was filed with a retaliatory motive and was lacking a reasonable basis in fact or law").

potentially attributable to Greg's beneficial interest and as Reid ultimately withdrew $170,000 from his beneficial interest in the trust to satisfy the judgments against Greg. As to Greg's complaint that the Bank acted unreasonably in objecting in bankruptcy court to Greg's proposed plan to pay the judgment mount over a fifty-four month period, Greg likewise eventually acceded to that objection, paying the money he owed and dismissing the bankruptcy petition.

Notwithstanding the Bank's ultimate success on the litigation at issue, however, the parties have not adequately briefed the question whether the Bank had probable cause to bring the AUFTA claim or to object to Greg's bankruptcy plan. Neither have the parties addressed the question whether *DeMartini* applies in a Title VII context. Because we conclude, on other grounds, that the district court correctly granted summary judgment to the Bank on Plaintiffs' retaliatory-litigation claim, we leave resolution of the question whether *DeMartini* applies to a Title VII retaliation claim for another day.

3.    Viability of a Third-Party Retaliation Claim Based on the Bank's Litigation Against Plaintiffs

Assuming the viability of Plaintiffs' retaliatory-litigation claim notwithstanding the uncertainty that the claim meets the threshold requirement discussed above, Plaintiffs must still clear the hurdles established for a third-party retaliation claim: that is, a claim that the particular plaintiff can be awarded damages under Title VII based on actions taken by the defendant for the purpose of

24

retaliating against someone other than the plaintiff.  Specifically, Plaintiffs, who were not employees of the Bank, claim that the Bank engaged in the "scorched earth" litigation against them described above in order to retaliate against the Bank's employee and their relative: Ragan Livingston.  The district court concluded that Greg, Reid, and Andrew satisfied the requirements set out in *Thompson* for pursuing a third-party retaliation claim against Marion Bank.

We are not so sure about that conclusion.  In assessing this issue, it is clear that Plaintiffs here present a far weaker justification for third-party claimant status than did the plaintiff in *Thompson*.  Thompson was both the fiancé of a woman who had alleged unlawful conduct under Title VII by her employer and an employee himself of that employer, and the Supreme Court concluded that the employer's firing of Thompson to retaliate against his complaining fiancée met the Court's newly-announced standard for the filing of a third-party retaliation claim.

Specifically, as to the first element of that test—whether, pursuant to *Burlington*, the employer's action against the third party might have dissuaded a reasonable worker from making a charge of discrimination—the Supreme Court found it obvious that firing a complaining employee's fiancé/co-worker would dissuade that employee from charging discrimination.  In this case, however, it is far from obvious that the litigation measures taken by the Bank in trying to recover on judgments owed by Greg could be construed as actions that would have

25

dissuaded a reasonable employee in Ragan's position from voicing her sexual harassment complaint. Presumably, a reasonable employee would assume that a relative who owed the employee's employer a great deal of money would be expected to honor a judgment requiring the payment of that money—regardless of whether or not the employee happened to have made a complaint on an entirely unrelated matter. Similarly, as to the second element of the test, which looks to whether the third-party plaintiff is an "aggrieved party" under the statute, it is likewise not immediately apparent how disallowing a lawsuit by an employer against a complaining employee's relative to recover monies the relative undisputedly owes the employer is a prohibition that somehow fits within the "zone of interests" served by Title VII.

Again, though, because we conclude that summary judgment is warranted for the Bank on traditional *McDonnell Douglas* grounds, we need not decide the novel question whether Plaintiffs qualified under *Thompson* as proper third-party retaliation claimants for purposes of the retaliatory-litigation claim. Instead, we will assume without deciding that the district court correctly concluded that Plaintiffs so qualified. And, as we next explain, the district court correctly concluded that the Bank was entitled to summary judgment on this claim.

4.    Summary Judgment Is Warranted for the Bank on the Retaliatory-Litigation Claims Based on Application of the *McDonnell Douglas* Standard

26

As set out earlier in this opinion, to establish a prima facie case of retaliation on their third-party claim based on the Bank's filing of litigation against them, Plaintiffs must show that: (1) their close relative, Ragan Youngblood, engaged in protected conduct; (2) Marion Bank took adverse action against Plaintiffs; and (3) there is a causal link between the two events. Assuming Plaintiffs can establish a prima facie case, the burden shifts to the Bank to articulate a legitimate, nonretaliatory reason for its action. If that burden is met, Plaintiffs must rebut the Bank's articulated reason by producing evidence from which one could reasonably conclude that the Bank's reasons for its actions were pretextual and that the real reason for the particular adverse action was retaliation.

Both at the prima facie stage and at the stage of analysis after which the defendant has articulated a legitimate, nonretaliatory reasons for its action, the plaintiff is called on to show that the evidence demonstrates the requisite causal connection. As for the causation prong of the prima facie test, the plaintiff must show "that the protected activity and the adverse action were not wholly unrelated." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc) (quoting *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277–78 (11th Cir. 2008)). A plaintiff can establish a prima facie causal link "by showing close temporal proximity between the statutorily protected activity and the adverse . . . action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364

(11th Cir. 2007). It is true that "mere temporal proximity, without more, must be very close." *Id.* (internal quotation marks omitted). At the stage of summary judgment proceedings in which the plaintiff must rebut the defendant's proffered nonretaliatory reason for its action, however, the plaintiff must meet the more demanding "but for" test. Specifically, citing *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013), *Gogel* noted that the Supreme Court had held that the "but for" test is to be applied in determining whether a plaintiff has ultimately shown the requisite causal connection for a Title VII retaliation claim. *Gogel*, 967 F.3d at 1135 n.13. That is, the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action. Further explaining that we have "integrated this but-for standard into our summary judgment analysis," the *Gogel* court applied this standard at the pretext stage of its inquiry.[5] *Id.*

Plaintiff failed to meet the causal requirement at either the prima facie or the pretext-rebuttal stage of the analysis. As to the prima facie stage, close temporal proximity between the statutorily protected activity and the adverse employment

---

[5] *Gogel* assumed, however, that the standard for examining causation at the prima facie stage of summary judgment analysis remains as described above: that is, a showing that the protected activity and the adverse action were not wholly unrelated. *Id.* at 1135 & n.13.

action can meet the causal requirement, but "mere temporal proximity, without more, must be very close." *Thomas*, 506 F.3d at 1364 (internal citations omitted). And the converse is also true: "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.*

In this case, the alleged "scorched-earth litigation" constituting the adverse action occurred well after Ragan's much earlier claim of sexual harassment. Yet, even assuming that Plaintiffs made a prima facie case, one could not reasonably infer that but for Ragan's protected activity the Bank would not have engaged in the particular litigation at issue. As the earlier factual recitation indicates, after the failure of the Bank's initial efforts to garnish Greg's income, the well seemed to be dry and the Bank had taken no further efforts to collect on its judgment. Everything changed in January 2012 when Greg's father died and Mike Tolar mailed the Bank a copy of the original trust and the 2010 addendum. Given Greg's removal of himself as a beneficiary from what was labeled as an irrevocable trust, the Bank official overseeing the earlier collection effort became concerned that Greg was trying to shift his interest in the trust to someone else in an effort to shelter assets he could use to satisfy the existing judgments. That concern prompted the Bank to retain a bankruptcy partner at Bradley Arant to advise whether this event created a potential pool of money from which the Bank might

be able to collect on the judgments whose value were now totaling approximately $170,000. That attorney obviously thought so, as he entered a notice of appearance in February 2012 in the old collection actions and subsequently filed the AUFTA suit alleging a fraudulent transfer.

These events caught Greg's attention who first inquired whether the Bank would accept monthly payments. The Bank's attorney invited a more specific offer, to which Greg responded that he would settle the almost $170,000 owed for $40,000: an offer that the Bank rejected until it could conduct more discovery. In March, the Bank obtained a TRO to stop the family trust from distributing money attributable to Greg or Reid's beneficial interest. In response, Greg filed for Chapter 13 bankruptcy. His proposed plan, however, was to pay the amount owed over a fifty-four month period of time. Unhappy with that proposal—because it suspected that the plan was a ruse to avoid ever paying the Bank and because the proposal did not account for the lost-time value of the money owed—the Bank filed lengthy objections.

Greg has repeatedly asserted that although he was always willing to pay the bank what he owed, the Bank rebuffed those efforts and instead engaged in protracted litigation to stall that effort simply to cause Greg unnecessary expense and aggravation. Yet, his above-described acts do not support this assertion. Each action taken by the Bank was in response to something that Greg had initiated—

30

specifically, the altering of the irrevocable trust and the filing of a Chapter 13 bankruptcy petition that promised to pay the judgments, but only over a period of time so long that the trust funds to which Greg or Reid were entitled might become exhausted. Ultimately, Greg used money from Reid's interest in the trust to pay the $170,000.

The record indicates that at each step the Bank was responding to Greg's actions. Further, none of the courts involved in these collections proceedings ever ruled that the Bank's litigation was frivolous or even unmeritorious. As noted, the Bank obtained two TROs in connection with the AUFTA action. Indeed, rather than actually litigate his present assertion that the AUFTA claim and bankruptcy objections were without merit, Greg himself essentially acceded to the relief sought in those actions. In short, we agree with the district court that Plaintiffs have failed to produce evidence sufficient to support a reasonable inference that but for Ragan's claim of sexual harassment, the Bank would not have engaged in the litigation that Plaintiffs characterize as excessive. Instead, the evidence indicates that, in attempting to collect on judgments that Greg had at no time challenged, the Bank took the steps necessary to do so. And while Greg characterizes these steps as overzealous, it was his actions that prompted each of the Bank's responses. In short, Greg's effort to use his daughter's Title VII claim against the Bank to gain immunity from his obligation to repay a legitimate debt

31

simply has no traction here.  Therefore, we affirm the grant of summary judgment on the retaliatory-litigation claim.

### D.     Claims Based on the Bank's Decision to Stop Referring Legal Work to Greg

In addition to retaliation claims based on the Bank's attempts to collect on the judgments against Greg, Greg also argues that the Bank illegally retaliated against his daughter when it ceased farming out legal work to him.  Again, to be actionable under Title VII, Greg must first show that he is entitled, as a third-party claimant, to pursue such a claim.  Although we assumed without deciding that Plaintiffs could act as third-party claimants with regard to their retaliatory-litigation claim, we observed that it was very questionable whether Plaintiffs had satisfied either prong of the *Thompson* test.  That is, we expressed some doubt that, applying *Burlington*, a reasonable employee would be dissuaded from exercising her Title VII rights out of any concern that her employer might try to collect a validly-owed debt from the employee's relative.  We were also uncertain that a relative against whom collection measures were taken could be considered as lying within the zone of interests protected by Title VII.  If not within the zone of those interests, the third party could not be characterized as an aggrieved party.

Here, in complaining that the Bank ceased referring him work, Greg has a stronger argument as to the *Burlington* prong because one could reasonably surmise that Ragan might have been dissuaded from engaging in protected conduct

32

had she thought that the Bank would stop sending legal business to her father.  The "aggrieved party" prong, however, is still an obstacle.  Specifically, in *Thompson*, the third-party plaintiff was an employee of the employer being sued and he was fired by that employer.  Here, though the bank did stop referring legal work to him, Greg was never an employee, and was thus never fired.  Moreover, in its holding on the "persons aggrieved" prong of the analysis, the Supreme Court in *Thompson* emphasized that the plaintiff there "was an employee" of the defendant, and that "the purpose of Title VII is to protect employees from their employers' unlawful actions."  *See Thompson*, 562 U.S. at 178 (emphasis added).

In fact, a sister circuit has recently addressed the question whether a plaintiff who was not employed by the employer in question could sue that employer for retaliation as a third-party claimant.  That court said no:  a plaintiff must be an employee of the defendant to qualify as a "person aggrieved" by retaliation under the second prong of *Thompson.  See Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 665 (5th Cir. 2020) ("As a nonemployee, [the plaintiff] asserts interests that are not within the zone that Title VII protects."), *cert. denied*, 134 S. Ct. 1382 (Feb. 22, 2021).

As to the nature of the relationship between the third-party claimant and the employer-defendant, the facts in *Simmons* are very similar to the facts here.  In *Simmons*, the plaintiff had a business relationship with the defendant, his

33

daughter's employer. *See id.* The business relationship deteriorated after the plaintiff's daughter filed a pregnancy discrimination claim against the defendant. *See id.* According to the plaintiff, the deterioration was a result of the defendant's deliberate effort to retaliate against his daughter by taking various adverse actions against the plaintiff. *See id.* The plaintiff asserted a third-party Title VII retaliation claim, which the Fifth Circuit rejected out of hand.

In rejecting the plaintiff's claim, the Fifth Circuit found dispositive the fact that Simmons was not an employee of the defendant-employer, whereas Thompson had been a co-employee of his fiancée, who was the person who had engaged in protected conduct. *See Simmons*, 972 F.3d at 668. Noting *Thompson*'s "focus on Title VII's employee-protection purpose," the court in *Simmons* ultimately found that distinction to be determinative, observing that:

> It would be a remarkable extension of *Thompson*—and of Title VII generally—to rule that a nonemployee has the right to sue. The zone of interests that Title VII protects is limited to those in employment relationships with the defendant.

*Id.*

Thus, the *Simmons* court held that the plaintiff "lack[ed] Title VII standing" because he was not an employee of the defendant. *Id.* at 668. Were we to apply the rationale of *Simmons*, none of the plaintiffs here—Greg included—would have a right to sue Marion Bank for Title VII retaliation on either claim because Plaintiffs are not—and never were—employees of the Bank. But once again,

34

because we conclude that the Bank is entitled to summary judgment on Greg's claim relating to the discontinuation of referral business based on a traditional *McDonnell Douglas* analysis, we decline to reach the novel *Thompson* question arising from this claim. We therefore assume without deciding that his third-party claim can proceed.

Analyzing this claim under the *McDonnell Douglas* framework, we will first assume that Greg has made a prima facie case. That is, his daughter, Ragan, engaged in protected conduct, the Bank's decision to stop referring business to Greg was an adverse action, and the temporal connection between the two events was close. Under *McDonnell Douglas*, the burden of production then shifts to the Bank to articulate a neutral, nonretaliatory reason for its action. And the Bank has done so by explaining that it stopped referring legal work to Greg because its officers believed a conflict of interest had arisen as a result of Greg's assistance to Ragan with her own legal claim against the Bank. That explanation meets the Bank's "exceedingly light" burden at the second stage of the *McDonnell Douglas* analysis to articulate a legitimate, nonretaliatory reason for its adverse action. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1312 (11th Cir. 2016) (internal quotation marks omitted). *See also Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) ("Under *McDonnell Douglas*'s terms .

. . only the burden of production ever shifts to the defendant, never the burden of persuasion.").

Because the Bank has articulated a legitimate, nonretaliatory reason for its decision, the burden shifts to Greg "to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by [the Bank] were not the real reasons" for its action, and that the real reason was retaliation. *Furcron*, 843 F.3d at 1313 (internal quotation marks omitted). "Conclusory allegations" of retaliation, "without more, are not sufficient to raise an inference of pretext." *Id.* (internal quotation marks omitted). At this stage of the analysis, Greg can only survive summary judgment by presenting "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth" of each legitimate explanation proffered by the Bank. *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997)). More specifically, the evidence must support a reasonable inference that the Bank's asserted explanation is "merely a pretext" to mask retaliation. *Gogel*, 967 F.3d at 1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). That is, Greg must rebut the Bank's explanation that the reason it stopped referring legal work to him was because the Bank believed that Greg's legal assistance to someone who was suing the Bank placed him in an adversarial posture with the Bank: a position that the Bank felt inappropriate for its own lawyer to take.

In assessing whether Greg has met his burden, we are mindful of our directive on this point in *Gogel*. As this Court en banc stated in *Gogel*, "We have repeatedly emphasized that provided the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Id.* at 1136 (citations and quotation marks omitted and alterations accepted). Which means that "to establish pretext at the summary judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence. A reason is not pretext for retaliation unless it is shown *both* that the reason was false, *and* that retaliation was the real reason." *Id*. (citations and quotation marks omitted and alterations accepted) (emphasis in original). In short, "in determining whether the plaintiff has met her burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, [the] employer would not have [taken the adverse action]." *Id*. Further, "[p]rovided that the proffered reason is one that might motivate a reasonable employer . . . the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

Greg has failed to produce any evidence of pretext to rebut the Bank's explanation for its decision to stop referring legal work to him in October 2008—namely, the conflict of interest that the Bank's officers believed to have arisen as a result of Greg's assistance with, and apparent advocacy for, a planned legal action by Ragan that was adverse to the Bank. To the contrary, all the record evidence, including the unrebutted testimony of Nichols and Greg's own testimony, supports the Bank's explanation.

Contrary to Greg's argument, the temporal proximity between Ragan's protected conduct and the Bank's decision to stop referring work to Greg does not establish pretext. *See Gogel*, 967 F.3d at 1137 n.15 ("While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient.").[6] Nor does Greg satisfy his burden at the pretext stage of the inquiry to rebut the Bank's explanation merely by asserting his belief that he had not become adversarial to the Bank as a result of his involvement in developing

---

[6] In support of his argument to the contrary, Greg cites case law for the principle that causation can be shown by evidence that "the protected activity and the [adverse action] are not completely unrelated." But as noted *supra*, while traditionally applied at the prima facie stage, that is not the operative standard once we get to the pretext stage of the *McDonnell Douglas* analysis. *See Gogel*, 967 F.3d at 1135 ("To establish the necessary causation [at the pretext stage], a plaintiff must demonstrate that her protected activity was a but-for cause of the alleged adverse action by the employer.").

Ragan's sexual harassment claim.[7] *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").  Indeed, Greg admits that he met with the Bank's board chair in September 2008 to discuss Ragan's harassment allegations, to ask that the Bank investigate Ragan's claim, and to seek job protections for Ragan while the investigation was ongoing.  Greg also informed the board chair during this same meeting that Ragan likely would be filing an EEOC charge.  Given this exchange, the Bank's board chair and its officers understandably concluded that Greg was providing assistance to Ragan in support of a future sexual harassment claim against the Bank.  Whether or not Greg perceived his involvement in his daughter's dispute with the Bank as a conflict of interest, the Bank certainly did.  *See Alvarez, id*; *Gogel*, 967 F.3d at 1136.  And based on that determination, the Bank decided to stop referring legal work to Greg.

In sum, the Bank met its burden of articulating a legitimate, nonretaliatory reason for its decision to stop referring its own legal work to Greg, but Greg failed to rebut the Bank's proffered explanation with any evidence of pretext.

---

[7]  In support of this assertion, Greg cites Ragan's testimony in this case that she filed her EEOC charge on her own and without Greg's assistance.  Yet, this testimony is contradicted by Ragan and Greg's testimony in the underlying Title VII case, and with the documentary evidence in this case, including the November 2008 letter Greg sent to the EEOC in his capacity as "her legal counsel."  At any rate, Greg has not provided evidence that calls into question the genuineness of the Bank's belief concerning Greg's involvement in Ragan's threatened litigation.

39

Accordingly, the Bank is entitled to summary judgment on Greg's retaliation claim based on the Bank's termination of its working relationship with Greg.

## II.   Plaintiffs' Claims against Bradley Arant

### A.   Standard of Review

We review the district court's Rule 12(b)(6) dismissal of the claims against Bradley Arant de novo, accepting the allegations in the complaint as true and construing them in the light most favorable to Plaintiffs. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012). Dismissal is warranted under Rule 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible when it is supported by facts that permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.   Analysis

In support of their Title VII retaliation claims against Bradley Arant, Plaintiffs claim the law firm retaliated by initiating "excessively aggressive" litigation against them, including various collection actions and an AUFTA claim. The district court correctly dismissed these claims under Federal Rule 12(b)(6). Title VII's anti-retaliation provision prohibits retaliation by an employer "against any of his employees" because the employee has participated in a Title VII

proceeding or opposed an employment practice made unlawful by Title VII. *See* 42 U.S.C. § 2000e-3(a). By its plain terms, this provision only protects an employee from retaliation. *See id.* (emphasis added). Plaintiffs do not allege an employment relationship between themselves and Bradley Arant, and it is apparent from the face of the complaint that no such relationship existed.

As discussed above, the Supreme Court has held that Title VII's retaliation provision can give rise to a claim for third-party retaliation under certain circumstances. *See Thompson*, 562 U.S. at 174–78. Under *Thompson*, an employer can conceivably retaliate against an employee—and thus violate Title VII—by taking adverse action against a close relative of the employee. *See id.* Plaintiffs here claim they were third-party victims of retaliation against Ragan, as a result of Ragan's decision to pursue a sexual harassment claim against Marion Bank. But Plaintiffs do not allege that Ragan was an employee of Bradley Arant, as would be required to recover under Title VII on a third-party retaliation theory. *See id.*

Plaintiffs argue that Bradley Arant can be liable for its alleged retaliation against them under an agency theory, but that argument is unprecedented and unsupported by any case law. It would be a novel proposition indeed to hold that Bradley Arant's legal representation of the Bank in debt collection litigation made the law firm an agent with respect to the Bank's employment practices. Nor can

41

Bradley Arant be liable under Title VII on a joint employer theory, as Plaintiffs suggest, because there are no facts to suggest that Bradley Arant exercised any control over Ragan's employment with the Bank.  *See Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1244–45 (11th Cir. 1998) (noting that the joint employer theory of liability is focused on "the degree of control an entity has over the adverse employment decision on which the Title VII suit is based").

Even under the third-party retaliation theory announced in *Thompson*, there simply is no basis for holding Bradley Arant liable on the Title VII retaliation claims asserted by Plaintiffs in this case.  Accordingly, we affirm the district court's dismissal of the Title VII retaliation claims asserted against Bradley Arant in this case.

## CONCLUSION

For the reasons stated above, we affirm the district court's order dismissing Plaintiffs' Title VII retaliation claims against Bradley Arant, as well as its order granting summary judgment to Marion Bank on Plaintiffs' Title VII claims against the Bank.

**AFFIRMED.**

42