[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11222

Non-Argument Calendar

_____

CLAUDETTE STEELE,

Plaintiff-Appellant,

*versus*

BIRMINGHAM JEFFERSON CIVIC CENTER AUTHORITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:17-cv-02139-SGC

_____

Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

Claudette Steele sued her former employer, the Birmingham Jefferson Civic Center Authority ("BJCC"), alleging that it terminated her employment based on race in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1).  The district court granted summary judgment to BJCC.  It found that Steele failed to show she was treated worse than a similarly situated employee outside of her protected class or to present other evidence sufficient to create a triable issue of discrimination.  After careful review, we affirm.

## I.

Steele, an African-American female, was employed in some capacity by BJCC for over thirty years, working her way up from housekeeper to Custodial Services Manager, the position she held from 2008 until her termination in 2016.  In that role, Steele was broadly responsible for ensuring that BJCC—an entertainment venue whose facilities included exhibition halls, an arena, a concern hall, and a theater—was presentable to the public.  She supervised around twenty full-time housekeepers and groundskeepers, in addition to contract laborers.

BJCC considered Steele a "stellar" performer until shortly before her termination.  She consistently received excellent yearly performance reviews, with evaluators commenting positively on her leadership, management, communication, and motivational

skills.  And with Steele in charge, the BJCC complex was the cleanest it had been in a long time, according to the Director of Human Resources, Elma Bell.

In August 2016, however, the CEO of BJCC, Tad Snider, received an anonymous email complaint about Steele.  The email pleaded that the "housekeeping department is in need of help" due to "mistreat[ment], unfairness, bribery, threats, [and] gossip" by Steele.  Suggesting there was widespread discontent with Steele, the email alleged that she showed favoritism to those who gave her food or money in overtime and weekend scheduling, gossiped about employees' personal matters outside the department, and spoke disrespectfully to employees.

BJCC retained Michael Quinn, a retired employment lawyer, to investigate the email's allegations.  On November 7, 2016, Bell informed Steele she was being placed on leave with pay until the conclusion of Quinn's investigation.  Over the next few days, Quinn interviewed approximately 20 people, including Steele's boss, her assistant manager, her full-time employees, and a contract worker who was implicated in some of the alleged improper gift giving.

While some of the interviewees had positive or neutral things to say about Steele, at least half described Steele's management in negative terms.  And many of the complaints echoed allegations in the anonymous email, including that she bullied and threatened employees and talked to them like children, made overtime and weekend scheduling decisions based on favoritism and

retaliation, gossiped about employees' personal business, made people cry, and told employees that upper management did not like or care about the concerns of Black employees. Multiple employees recounted how Steele harassed an employee for several hours after he complained to Human Resources about a decision she made. Other employees reported Steele was demeaning and disrespectful in handling scheduling requests for difficult personal issues. One employee reported that half of the employees were thinking of leaving because of the way they were treated by Steele. Bell, who participated in the interviews with Quinn, testified some of the individuals interviewed "[sat] in from of [them] in tears, crying profusely, begging [them], pleading with [them] not to disclose what they were telling [them] because of fear of retaliation [by Steele]."

After completing his investigation, Quinn concluded it was obvious Steele had created a serious problem in Custodial Services. He attributed the problem to Steele's unprofessional management style, as exemplified by her "mean and disrespectful" treatment of the employees under her supervision, exhibition of favoritism towards certain employees, gossiping about employees' personal lives, discriminatory comments about her white supervisors, and retaliatory conduct towards employees who complained about her to her superiors. He also found that Steele's supervisor, David Smith, was not aware of this unprofessional conduct because employees were afraid to complain to him.

Based on his findings, Quinn recommended that BJCC exercise one of three options: (1) remove all Steele's supervisory responsibilities while allowing her to retain her position as Custodial Services Manager, (2) transfer Steele to another position, or (3) terminate Steele's employment, if neither of the first two options was feasible. BJCC determined it was not feasible to strip Steele of her supervisory responsibilities while allowing her to retain her position, given the employees' accounts of retaliatory conduct and fear of retaliation. Moreover, there was not another available and appropriate position to which Steele could be transferred, according to Bell. Concluding that the first two options were not feasible, BJCC opted to terminate Steele's employment, effective November 18, 2016. Snider upheld her termination on appeal, stating in a letter than the decision was based on corroborated complaints of Steele's unprofessional and disrespectful management style.

Steele filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and then a lawsuit against BJCC in federal district court. Steele's *pro se* complaint originally alleged race and sex discrimination in violation of both Title VII and 42 U.S.C. § 1983. After retaining counsel, Steele voluntarily abandoned her § 1983 claims and her Title VII sex-discrimination claim.

The district court[1] granted summary judgment to BJCC. The court concluded that Steele's race-discrimination claim failed because she could not identify a valid comparator outside her protected class who engaged in similar misconduct but received more favorable treatment. The court found that no valid comparison could be made between BJCC's treatment of the Director and Assistant Director of Sales, Susette Hunter and Renee Browning, who were white, following a similar investigation by Quinn, because their misconduct was "qualitatively and quantitively different" than Steele's. This appeal followed.

## II.

We review *de novo* a district court's summary-judgment ruling, construing the evidence and drawing all reasonable inferences in favor of Steele, the nonmoving party. *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1288–89 (11th Cir. 2021). Summary judgment is appropriate if "the movant show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists if a reasonable jury could return a verdict for the nonmoving party. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).

---

[1] We use "district court" or "court" to refer to the magistrate judge, who exercised full jurisdiction by consent of the parties. *See* 28 U.S.C. § 636(c)(1).

As relevant here, Title VII makes it unlawful for employers to base employment decisions on race. 42 U.S.C. § 2000e-2(a)(1). Although we often apply a burden-shifting framework when evaluating Title VII claims at summary judgment, the "crux of the analysis" is simply "whether the plaintiff has offered sufficient evidence to establish a genuine issue of discrimination." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1240 (11th Cir. 2016).

To prove discriminatory intent, Steele points to two white employees who, in her view, were treated more favorably, despite engaging in similar misconduct. She claims that both Hunter and Browning engaged in misconduct that, like Steele, made them subject to immediate discharge, but they received counseling and training instead of being terminated.

When a plaintiff seeks to prove discrimination with evidence that a similarly situated employee outside her protected class was treated more favorably than she was, she must show that the comparator was "similarly situated in all material respects." *Lewis v. City of Union City,* 918 F.3d 1213, 1226–27 (11th Cir. 2019) (*en banc*). A valid comparator ordinarily is someone who engaged in the same basic conduct as the plaintiff, who was subject to the same employment policies and decisionmaker, and who shared the plaintiff's employment or disciplinary history. *Id.* at 1227–28.

Here, the district court properly granted summary judgment because the evidence, even in the light most favorable to Steele, does not support a reasonable inference that her termination was motivated by her race. Steele's two proffered

comparators are not similarly situated in all material respects, and she presents no other evidence suggestive of discriminatory intent or pretext in BJCC's explanation of its actions.

First, it is undisputed that BJCC based its termination decision on a thorough, third-party investigation, which found that Steele engaged in threatening and intimidating conduct towards her employees. Under BJCC policies, such conduct "may" subject an employee to immediate discharge without prior progressive discipline. While Steele disputes the allegations against her, she offers no reason to doubt that many employees spoke against her during the investigation or that BJCC relied on those comments in good faith. *See Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race.'").

Second, we agree with the district court that Hunter and Browning are not valid comparators. To begin with, that BJCC's policies may have authorized termination of Hunter or Browning is not alone sufficient to create an inference of discrimination. The decision to terminate remained discretionary under the relevant policies. So the question is whether there is sufficient evidence to show that BJCC exercised its discretion in Steele's case in a discriminatory manner. And to assess that question, we must evaluate whether Browning's and Hunter's situations were similar in "all material respects." *See Lewis*, 918 F.3d at 1227–28.

21-11222                Opinion of the Court                9

The record shows that, shortly before the Steele investigation, BJCC had hired Quinn to investigate and mediate a conflict between Hunter and Browning, the Director and Assistant Director of Sales, respectively. Previously friends, Hunter and Browning ran into conflict after Browning was hired, leading to Browning's repeated complaints to Human Resources about Hunter and a hostile work environment. After conducting multiple interviews, Quinn concluded that Hunter had an aggressive and at times abrasive personality, which followed over into her management style, leading to some employee complaints and actions that bordered on insubordination. On the other hand, multiple employees reported issues with Browning's responsiveness, work ethic, and attitude. Finding fault on both sides but nothing worthy of termination, Quinn recommended professional management training for Hunter, and limiting contact with Browning. For Browning, he recommended that she improve her communication skills and be more responsive. BJCC ultimately hired a leadership coach for Hunter and implemented a plan to limit contact.

Browning is not a valid comparator. Browning's misconduct involved performance deficiencies typified by unavailability and unresponsiveness, and allegedly showing up for work smelling of alcohol. It did not relate to her management of any other employee, as it did for Steele.

Because Browning did not engage in the same basic misconduct as Steele, she is not a proper comparator. *See Lewis*, 918 F.3d at 1227–28. Whether Browning's misconduct could be viewed as

worse than Steele's misconduct, as Steele asserts, it "is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). And no inference of discriminatory motive can be drawn from BJCC's different treatment of different situations.

Nor is Hunter a valid comparator. As the district court observed, there are some similarities between Hunter and Steele. Both were described as "abrasive" personalities with sometimes "unprofessional" management styles, which had led to workplace conflict. "But [that] broad-brush summary glosses over critical differences." *Lewis*, 918 F.3d at 1230.

Although Hunter's personality sometimes made her difficult to work with, her misconduct was, as the district court put it, both qualitatively and quantitively different than Steele's misconduct. Quinn's report about Hunter indicated that, aside from Browning, one other employee had resigned due to conflict with Hunter. In contrast to these relatively isolated issues, Quinn's report about Steele described fairly widespread discontent among employees supervised by Steele. And significantly, there is no indication in Quinn's report that Hunter, unlike Steele, had retaliated against employees who had gone to Human Resources or upper management to complain about her, or had otherwise abused her management and scheduling authority to reward or retaliate. Because of Steele's threatening and intimidating conduct, according to Bell,

some of the interviewees were "in tears, crying profusely, begging [them], pleading with [them] not to disclose what they were telling [them] because of fear of retaliation [by Steele]." Nothing of the kind was reported about Hunter. So despite some similarities, material differences between Steele's and Hunter's situations support BJCC's exercise of its discretion to terminate in Steele's case but not in Hunter's. *See Lewis*, 918 F.3d at 1228 ("An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects.'").

Nor does Steele meaningfully dispute BJCC's evidence that it considered multiple options, as proposed by Quinn, but viewed termination as the only feasible one. According to Bell, it was not feasible to remove Steele from supervision duties in her current position, given the employees' accounts of retaliatory conduct and fear of retaliation, and no suitable positions were open for transfer. Bell explained that, as a result, BJCC believed termination was the only viable open to protect the employees.

Finally, while the lack of a comparator is not necessarily dispositive at summary judgment, *see Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011), the record here lacks any circumstantial evidence from which a jury could otherwise infer that Steele's termination was motivated even in part by her race. Accordingly, the district court properly granted summary judgment to BJCC on Steele's claim of race discrimination.

### III.

In sum, we affirm the district court's grant of summary judgment on Steele's race-discrimination claim under Title VII.

**AFFIRMED.**