[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 24-11343

Non-Argument Calendar

_____

SCHYLA M. JACKSON,

Plaintiff-Appellant,

*versus*

ATLANTA PUBLIC SCHOOLS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-01056-SDG

_____

Before LAGOA, HULL, and WILSON, Circuit Judges.

PER CURIAM:

Schyla M. Jackson appeals the district court's grant of summary judgment in favor of her former employer, Atlanta Public Schools ("APS"), on her claims of discrimination and retaliation under the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* After review, we affirm.

## I. BACKGROUND

### A.    Jackson's Employment With APS

In 2017, Jackson worked as an Administrative Assistant in APS's Logistics Support Services ("LSS") Department. The LSS Department provides warehouse services, including receiving, storing, and disposing of items, for the school district. Jackson handled clerical duties, including completing payroll timecards and preparing weekly operational and financial reports, and provided customer service by phone.

James Carter, the Logistics Support Manager, was Jackson's supervisor and worked with her in the main office. Jackson, at age 58, was the oldest and only female employee Carter supervised. The remaining employees under manager Carter's supervision were younger male Logistics Technicians, whose duties included receiving and storing items in the warehouse, driving trucks to make deliveries, and performing inventories. Manager Carter

reported to Alicia Morningstar, the Executive Director of Procurement and Warehouse Operational Services.

## B.    Jackson's First EEOC Charge on August 21, 2017

On August 21, 2017, Jackson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Jackson alleged that three months earlier, on May 18, 2017, Carter "emailed negative information about [her] to the Executive Director," and that Jackson then complained to Human Resources that Carter was subjecting her to a hostile work environment and bullying her. Jackson alleged discrimination based on her age and sex and retaliation for opposing unlawful employment practices.

The "negative information" email mentioned in the EEOC charge involved this incident. On May 18, 2017, Jackson advised Carter that she had a meeting in another building the next day. Thereafter, in an email, Carter stated, "Can you please check with me prior to you scheduling meetings to ensure I will be available to cover the office in your absence." Carter told Jackson that he also had a meeting scheduled, but he would try to return to the building before Jackson had to leave. Carter copied his supervisor, Morningstar, on this email. Jackson included Carter's email in her EEOC charge because she believed Carter was trying to assassinate her character.

In her deposition, Jackson said Carter's harassing behavior included: (1) telling her she needed to focus and take time to complete work tasks that were piling up, (2) asking her what was taking so long to complete tasks, (3) slamming his hand on a desk

and saying he was "sick and tired of this" when he felt she was challenging him, (4) pointing his finger at her, and (5) using his voice tone, facial expressions, or body language to express frustration with her when Carter and she did not see eye-to-eye on work-related matters.

Jackson admitted, however, that no employee ever referred to her age or sex and that Carter's alleged hostile remarks had nothing to do with her age or sex.

## C.    Jackson's Second EEOC Charge on March 7, 2018

On March 7, 2018, Jackson filed a second charge of discrimination with the EEOC. Jackson alleged that since filing her first charge (back in August 2017), Carter "continuously [] harassed" her and that, on February 21, 2018, she was terminated and "accused of displaying rude and unprofessional behavior."

Jackson's second charge also alleged that before she was terminated, she met with APS employees about her issues with Carter: (1) on October 12, 2017, she met with Alvah Hardy, the Executive Director of Facility Services, and said that Carter was subjecting her to a hostile work environment, and (2) on October 13, 2017, she met with Morningstar, Carter's direct supervisor, and told her that Carter was harassing her.

Multiple emails sent throughout October 2017 demonstrated Jackson and Carter's deteriorating work relationship. These emails began shortly after Jackson commented on Carter's decision to interview an applicant for a temporary

position in the warehouse, which Carter viewed as a challenge to his authority.

Starting on October 13, 2017, Carter sent Jackson an email with the subject line "Rude Behavior and Disrespect." Carter's email stated, "On October 11, 2017 you questioned my authority to hire[] a corporate temp employee . . . . This decision caused you to display a[] hostile attitude and [led] to you becoming very argumentative . . . . This email serve[s] as an official written warning documenting this incident."

Carter copied Morningstar on the October 13, 2017 email. Jackson believed that Carter sent the "Rude Behavior and Disrespect" email in "retaliation" for her requesting leave for a meeting later that day at APS's central office, although she later acknowledged that she sent her leave request to Carter several hours <u>after</u> Carter's email to her.

Two weeks later, on October 27, 2017, Jackson emailed Morningstar's assistant with a copy to Morningstar, Carter, and others. In the email, Jackson told Morningstar's assistant, "I have just inquired about the whereabouts about Mr. James Carter . . . . Do you have a leave slip on leave today? . . . As his Administrative Assistant, I should have been informed. This is not the first time this has happened."

On October 30, Carter replied to Jackson's "Leave Form" email, telling Morningstar and others that he was on approved leave that day. Carter attached an email from two weeks prior informing Jackson and others of his approved absence. Carter's

October 30 email also said, "I will get with Ms. Jackson again to ensure she is placing my approved leave on her work calendar as a reminder and to avoid contacting you or other staff when I am not in the office."

Also on October 30, in response to Jackson's own leave request to attend a medical appointment, Carter emailed Jackson and asked her to bring a doctor's note when she returned to work "due to [her] absences [] becoming excessive." Carter listed Jackson's absences during the 2017 year, which totaled approximately 16 days of leave. Jackson later admitted that Carter did not send this email because of her sex or age.

The next day, on October 31, Jackson forwarded Carter's email, requesting a doctor's note, to Pamela Hall, Chief Human Resources Officer. Jackson told Hall that after she asked about Carter's absence on October 27, Carter "counter attack[ed]" her by accusing her of excessive absences, proving that her attempts to address concerns would result in a hostile work environment. Jackson asked Hall for an administrative transfer to another department. Jackson later confirmed that this October 31 email to Hall was her "written harassment complaint" to HR and that this email made no allegation that the negative treatment she was receiving was due to her age or sex.

Besides the October 2017 email incidents with Carter, Jackson's second EEOC charge also described a verbal altercation she had with Logistics Technician Tori Johnson. On November 13, 2017, Johnson asked Jackson if he could see a catalogue he had

given her so that he could order a jacket, after which each of them accused the other of being rude.  In her deposition, Jackson said that she told Johnson that she would need to check with Carter to see if there was money in the budget for a jacket, to which Johnson responded that he was "tired of [Jackson]."  In his deposition, Johnson said he did not remember making the "tired" comment, but he recalled that the catalogue belonged to him, he was planning to purchase the jacket with his own money, and when Jackson tried "to bait [him] into an argument," he threw his hands up and left the room.

Later that day, Carter met with Johnson and Jackson separately.  Based on Jackson's history of rude behavior, Carter ultimately found Johnson's account more credible.  Carter issued Jackson a "Letter of Direction," explaining that he "discovered the problem started when [Jackson] made the statement to Mr. Johnson '[Y]ou guys have been here since 7:30 and you won't give me time to put down my bags before barging into my office.'"  Carter wrote that Jackson should not have questioned Johnson's authority to make the apparel order but instead should have directed Johnson to Carter.  The letter then instructed Jackson, "<u>You are required to assist the staff when employee[s] need assistance</u>.  In the future please refrain from using unkind remarks and assist coworkers with kindness and respect to avoid further disciplinary action."  At the bottom of the letter, Carter wrote that Jackson "refused to listen and read this document.  She feels I am forcing her to sign the document which is not true."

Jackson's second EEOC charge also stated that based on the verbal altercation with Johnson, Carter initiated disciplinary action against her. After Jackson contacted Hall about Carter's Letter of Direction and met with Hall on November 15, Hall referred Jackson to Kevin Hills, an Employee Relations Specialist for APS. Thereafter, on November 29, 2017, APS assigned Hills to investigate Jackson's concerns about retaliation and a hostile work environment.

On December 7, Hills sent Jackson an email (1) stating that Jackson told him by telephone that she and Carter had resolved her issues and (2) inquiring if she believed an investigation still was needed. Jackson responded that after further consideration, she changed her mind and thought her concerns needed to be investigated and addressed, and she wanted to remove from her personnel file "the documents [Carter] tried to force [her] to sign[]."

## D.    APS's Investigation

Beginning in December 2017, Hills interviewed Jackson, Carter, and seven other witnesses. Hills found that not one of the other eight witnesses corroborated Jackson's allegations against Carter or that Carter had created a hostile work environment. Instead, nearly every witness told him that Jackson "had repeatedly acted in a rude, unprofessional manner toward them and others." Comments about Jackson's behavior included that: (1) she was a "hassle to work with"; (2) she "acts as if she is the boss"; (3) she was "professional on some days and unprofessional other days";

(4) multiple warehouse visitors had complained about her; (5) she was "difficult to work with"; (6) some "delivery persons refused to interact with" her; and (7) she was "rude and hostile to coworkers and visitors."

Based on his investigation, Hills determined that Jackson's allegations against Carter "were baseless" and that, on the contrary, "it was Ms. Jackson who consistently displayed poor judgment and rude behavior toward coworkers and third parties." On January 16, 2018, Hills prepared an Investigation Summary Report that concluded that Jackson failed to maintain professional relationships and used abusive, offensive language in violation of Atlanta Board of Education ("Board") policies.

Based on Hills's recommendation, a disciplinary conference took place on January 29, 2018. The written notice for the conference stated that APS accused Jackson of violating Board Policies GCB-R(1) and GAGC by "displaying rude and unprofessional behavior towards APS employees, Contractors, and support agency representatives" and that her "conduct has resulted in personnel refusing to engage her in any professional interaction."[1] Notably, Jackson does not dispute that Hills did not

---

[1] APS cited two policies that Jackson violated. First, the Board's Policy GCB-R(1) governs the discipline and termination of classified employees like Jackson. That policy provides that willful violation of a Board policy or "offensive conduct or use of abusive, profane, threatening or offensive language towards students, parents, other employees, or to the public" are grounds for discipline, including termination.

know about her first EEOC charge until this January 2018 disciplinary conference, after Hills completed his investigation and report.

On February 2, 2018, Morningstar informed Hills that based on the evidence received at the disciplinary conference, Morningstar was recommending Jackson's removal through transfer to a position requiring "less interaction with other employees and/or the public" or termination. On February 21, 2018, Jackson was terminated because no suitable positions were available. About two weeks later, Jackson filed her second EEOC charge (March 7, 2018).

### E.    Jackson's Civil Service Hearings

On March 12, 2018, Jackson requested a civil service hearing to appeal her termination. After the hearing, at which multiple witnesses testified about their experiences working with Jackson, the hearing officer found "overwhelming" evidence supporting the conclusion that Jackson's "rude and unprofessional behavior" violated the Board's policies and affirmed APS's decision to terminate Jackson.

However, because this hearing officer did not send Jackson or her representative a copy of those findings before the deadline,

---

Second, the Board's GAGC policy governs employee ethics and requires employees to maintain honest, equitable, professional relationships with parents and other staff members and support cooperation between schools and the community. Violating this policy also can result in termination.

a second civil service hearing was held. After this second hearing, a different hearing officer found that "[c]learly, Ms. Jackson created a hostile and unprofessional work environment that was pervasive and counterproductive to the ideals of APS." On December 3, 2018, the Board adopted the second hearing officer's findings and affirmed Jackson's termination.

## F.    District Court Proceedings

In March 2020, Jackson sued APS. Her amended complaint alleged four counts: (1) discrimination based on sex, in violation of Title VII; (2) retaliation, in violation of Title VII; (3) discrimination based on age, in violation of the ADEA; and (4) retaliation, in violation of the ADEA. After discovery, APS moved for summary judgment and argued, as relevant, that no reasonable jury could find that APS retaliated against Jackson.

The magistrate judge's report and recommendation ("R&R") determined that Jackson could not establish a prima facie case of retaliation because only her initial 2017 EEOC charge was statutorily protected activity and Jackson could not establish that Carter or Hills knew about that EEOC charge when they made their disciplinary decisions. Nevertheless, the R&R determined that even if Jackson could establish a prima facie case, APS proffered a legitimate, nondiscriminatory reason for terminating her, and Jackson had failed to present evidence from which  a reasonable jury could find that the proffered reason was pretextual and that the real reason was unlawful discrimination.

The district court overruled Jackson's objections and adopted the R&R, granting summary judgment to APS on all of Jackson's claims. After the district court denied Jackson's motion for reconsideration, she timely appealed.

## II. STANDARD OF REVIEW

We review *de novo* a district court's order granting summary judgment, viewing all evidence and drawing all inferences in favor of the non-moving party. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). Summary judgment is appropriate when the record demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. DISCUSSION

As an initial matter, we address only Jackson's two retaliation claims on appeal. Jackson abandoned her two claims for sex and age discrimination based on disparate treatment and hostile remarks because her opening brief references them only in passing and without citations to legal authority or the record showing us how the district court might have erred in its rulings on these claims. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (holding that merely stating that an issue exists is insufficient and that "an appellant abandons a claim when [s]he either makes only passing references to it or raises it in a

perfunctory manner without supporting arguments and authority.").

Regarding her retaliation claims, Jackson argues that the district court erred in granting summary judgment to APS by incorrectly limiting her statutorily protected activity to her initial 2017 EEOC charge. Specifically as to her retaliation claims, Jackson contends that the district court wrongly excluded as non-protected activity (1) her October 12, 2017 meeting with Hardy; (2) her October 13, 2017 meeting with Morningstar; (3) her October 31, 2017 email to Hall; and (4) her November 15, 2017 in-person meeting with Hall.

But whether these four events involved statutorily protected activity makes no difference. Even assuming all these events constituted statutorily protected activity, we explain why the district court did not err in granting summary judgment to APS on Jackson's retaliation claims under Title VII and the ADEA.

## A.     Retaliation Principles

Both Title VII and the ADEA make it unlawful to discriminate against an employee because she "has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a); *see also* 29 U.S.C. § 623(d). In other words, "employers cannot retaliate against employees who have complained about—that is, opposed—discrimination based on sex, age, or other protected characteristics." *McCreight v. AuburnBank*, 117 F.4th 1322, 1339 (11th Cir. 2024) (quotation marks omitted).

Retaliation claims brought under either Title VII or the ADEA "require the same proof and analytical framework." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023). That is, in assessing whether the plaintiff's circumstantial evidence is sufficient for summary judgment purposes, she may utilize either the three-step "*McDonnell Douglas* framework [or] the convincing mosaic approach," which serve as "two paths to the same destination—the ordinary summary judgment standard." *McCreight*, 117 F.4th at 1335; *see Berry*, 84 F.4th at 1307. As such, we will analyze Jackson's retaliation claims under both the *McDonnell Douglas* and convincing mosaic frameworks.

We start with the elements of a retaliation claim under the three-step *McDonnell Douglas* framework. First, the employee bears the burden of establishing a prima facie case of retaliation by proving: "(1) she engaged in statutorily protected conduct—that is, conduct protected by [statute]; (2) she suffered an adverse action; and (3) there is some causal relationship between the two events." *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021) (quotation marks omitted). Establishing a prima facie case of retaliation creates a "presumption that the adverse action was the product of an intent to retaliate." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc).

Second, if the employee establishes her prima facie case, the burden shifts to her employer to articulate a "legitimate, nonretaliatory reason" for its adverse action. *Berry*, 84 F.4th at 1307.

Third, after the employer proffers a legitimate, nonretaliatory reason, the burden shifts back to the employee to prove that her employer's explanation was a pretext for retaliation. *Id.* If the employer's proffered reason was "one that might motivate a reasonable employer," the employee "must address that reason head on and rebut it." *Tolar*, 997 F.3d at 1298; *Berry*, 84 F.4th at 1307-08 (quotation marks omitted). Rebutting an employer's legitimate reason does not mean "simply quarreling with the wisdom of it"—instead, "she must point to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that create a genuine dispute of material fact as to whether the proffered reason is pretextual. *Berry*, 84 F.4th at 1308 (quotation marks omitted). "[T]hroughout this entire process, the ultimate burden of persuasion remains on the employee." *Gogel*, 967 F.3d at 1135.

But *McDonnell Douglas* is only one way to prove retaliation with circumstantial evidence. Indeed, "an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent"—sometimes referred to as the "convincing mosaic" approach. *Berry*, 84 F.4th at 1310; *McCreight*, 117 F.4th at 1335. Under this theory, the employee need only point to circumstantial evidence that raises a reasonable inference of unlawful conduct such as "evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the

employer's justification for its action is pretextual." *Berry*, 84 F.4th at 1311.

## B.    Jackson's Retaliation Claims Fail

The district court correctly granted summary judgment for APS on Jackson's retaliation claims.  First, regardless of whether Jackson met her prima facie burden, her argument that APS terminated her in retaliation for her statutorily protected activity still fails on the third prong of the *McDonnell Douglas* analysis— pretext.  Second, Jackson fails to present a convincing mosaic of circumstantial evidence that would create a reasonable inference of retaliation.

To start, assuming Jackson made a prima facie case under the first step of *McDonnell Douglas*, APS provided ample evidence that its reason for terminating Jackson—her rude and unprofessional conduct—was legitimate and nondiscriminatory. Hills's investigation revealed a pattern of Jackson exhibiting rude and unprofessional behavior toward coworkers and visitors to the warehouse.  During the course of the investigation, most of the witnesses reported that Jackson was "difficult to work with" and "rude and hostile to coworkers and visitors," to the point that even some "delivery persons refused to interact with" her.  The Board's GCB-R(1) and GAGC policies specifically required employees to maintain professional relationships and prohibited using abusive or offensive language, and a violation of either policy can result in termination.  APS therefore met its "exceedingly light" burden to produce evidence that it was motivated by a legitimate reason for

its action. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1340 (11th Cir. 2023).

The burden then shifted back to Jackson to show that APS's proffered reason was pretextual and that its real reason for terminating her was to retaliate for her engaging in protected activity. *Berry*, 84 F.4th at 1307. On appeal, Jackson argues that APS's investigation was a "hatchet job investigation" of her conduct instead of an impartial investigation of Carter. Jackson, however, cites no evidence in the record that supports her view that APS set out to investigate her.

Specifically, Jackson accuses Carter of developing a "scheme" to conduct a false investigation in order to terminate her, but again, no evidence supports a reasonable inference of Carter's involvement in the decision to investigate or that he interfered with Hills's investigation. On the contrary, the evidence, specifically emails between Jackson and Hills about the investigation, demonstrates not only that Hall assigned Hills to investigate based on Jackson's complaint about the Johnson altercation, but also that Hills specifically asked Jackson on December 7 if she wanted to proceed with an investigation of her allegations. Jackson responded that she wanted to proceed to have her "concerns addressed and the documents [Carter] tried to force [her] to sign removed from [her] personnel file." Thus, it was Jackson, not Carter, Hills, or APS, who made the ultimate decision that Hills should investigate.

Further, insofar as Jackson takes issue with the scope of Hills's investigation, Jackson was not entitled to believe that the investigation would not necessarily involve the determination of whether Carter had a legitimate reason to take issue with Jackson's conduct when he (1) sent her the "Rude Behavior and Disrespect" email; (2) sent his supervisor his response to Jackson's "Leave Form" email that wrongly accused him of taking leave without notifying her; and (3) issued her the "Letter of Direction" reminding her that her job required her to help her coworkers.

Moreover, Jackson's contention that the investigation was a scheme and was biased against her rests on speculation, which is legally insufficient to establish that APS's reason for terminating her was pretext for retaliation. *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (explaining that "unsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion" because "[s]peculation does not create a *genuine* issue of fact").

Finally, Jackson failed to present a convincing mosaic of circumstantial evidence that would raise a reasonable inference of retaliation. Jackson points to much of the same evidence she relies on to argue pretext under *McDonnell Douglas*. But as we have explained, that evidence fails to create a genuine dispute of material fact regarding whether Hills's investigation or Morningstar's decision was, in truth, unlawful retaliation, particularly in light of the overwhelming evidence of Jackson's intervening misconduct. *See id.* Put simply, her evidence, even viewed in the light most

favorable to her, would not permit a reasonable jury to infer that APS retaliated against her. *See Berry*, 84 F.4th at 1311 ("[I]nferences in favor of [an employee] can be based only on evidence—not on speculation."). Thus, under both *McDonnell Douglas* and a convincing mosaic theory, summary judgment on Jackson's retaliation claims was proper.

## IV. CONCLUSION

For all these reasons, we affirm the district court's grant of summary judgment in favor of APS.

**AFFIRMED.**