**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 23-12417

————————————————

EMILY VINCENT,

*Plaintiff-Appellant,*

*versus*

JEFFERSON COUNTY BOARD OF EDUCATION,

*Defendant,*

ATI HOLDINGS LLC,
   d.b.a. ATI Physical Therapy,
SAM SHADE,
   an individual,
MICHAEL TURNER,
   an individual,

*Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:21-cv-00514-ACA

————————————————

Before BRANCH, BRASHER, and ED CARNES, Circuit Judges.

BRASHER, Circuit Judge:

Emily Vincent worked as an athletic trainer for ATI Holdings LLC, a contractor that places athletic trainers at local schools. Vincent was placed at Pinson Valley High School, where she worked with its football team. After ATI removed Vincent from Pinson Valley at the request of its principal and assigned her to another school, she sued ATI for sex discrimination and retaliation under Title VII. *See* 42 U.S.C. § 2000e *et seq*. The district court granted summary judgment for ATI, and Vincent appealed.

Vincent maintains that she presented enough evidence to survive summary judgment on both her discrimination claim and retaliation claim. But, after careful review and oral argument, we conclude that (1) Vincent's claim that ATI removed her because of her sex fails because there is no evidence that ATI knew or should have known that the principal's request to remove her from Pinson Valley was sex-based; (2) Vincent's claim that she was offered a discriminatory reassignment fails because there is no evidence that ATI offered the reassignment options it did because of Vincent's sex; and (3) Vincent's retaliation claim fails because there is no evidence that ATI removed or reassigned her because she engaged in protected activity under Title VII. So, we affirm.

## I.

### A.

ATI is a rehabilitation services provider that specializes in sports medicine among other fields. As part of its services, ATI contracts with local schools to provide athletic trainers for their sports programs. ATI and Pinson Valley High School entered into such a contract. That contract required ATI to assign two individuals to provide athletic training services for the school.

Vincent worked for ATI as an athletic trainer under the supervision of Jason Pequette, ATI's sports medicine director. In 2017, ATI assigned Vincent to Pinson Valley, where she worked largely with the school's football team. There, she was supervised in part by the school's principal, Michael Turner.

During that year, Vincent reported to ATI that Chris Woodard, the other ATI athletic trainer at Pinson Valley, had allowed football players to talk about sex and simulate sex acts in an athletic training room. Soon after, an ATI manager informed Vincent that ATI was going to transfer her to a different high school. But after Vincent opposed the transfer, believing it was retaliation for her complaints about Woodard, she remained at Pinson Valley. ATI instead transferred Woodard to another school.

ATI placed at Pinson Valley another athletic trainer, Heath Blackmon, in 2019. Believing that Blackmon was doing a poor job at his trainer duties, Vincent reported her concerns to Turner. At Turner's request, Vincent documented Blackmon's issues and

emailed her observations to ATI staff. Shortly after, Turner emailed Pequette requesting that Blackmon be removed from Pinson Valley immediately. ATI complied. After Blackmon was removed from Pinson Valley, Pequette "gathered information from area supervisors about what positions were available" and "let Blackmon elect which location he preferred to transfer to." Doc. 54-1 at 4. Blackmon's pay did not decrease after his transfer.

In February 2020, about a month before Blackmon's removal, Pinson Valley had hired Sam Shade as its head football coach and athletic director. Vincent worked with the football team as the only woman under Shade. According to Vincent, on May 27 of that year, Turner asked her to be Pinson Valley's assistant athletic director, a position separate from her job as an athletic trainer. That position would require her to help football staff manage facilities and paperwork, and to ensure compliance with COVID-19 protocols. Four days later, Shade scheduled a meeting with other football coaches, and Vincent introduced herself at the meeting "as the athletic trainer and assistant athletic director." Doc. 54-3 at 23–24, 27.

But on June 3, 2020, Turner told Vincent that she would no longer hold her position as assistant athletic director and asked her to return to performing only her athletic trainer duties. According to Vincent, Turner did not explain his reasoning. Around the same time, Vincent asked one of her supervisors at ATI if there were other athletic trainer assignments around Birmingham; the

supervisor told her about "a couple of high schools" where she could keep the same pay, including Chelsea High School. Doc. 54-3 at 64.

The morning of June 5, 2020, Pequette emailed Turner: "I understand that we have some issues with [Vincent] and may need to move on. Hoping to discuss. Let me know when you are free." Doc. 65-14 at 12. Pequette testified at his deposition that sometime before he emailed Turner, someone whom Pequette could not remember had told him to contact Turner because Turner "had some issues" with Vincent. Doc. 54-12 at 13–15. So later that morning, Pequette and Turner spoke on the phone; Turner conveyed that "he wanted Vincent removed from performing athletic training services at Pinson Valley." Doc. 54-1 at 4; Doc. 54-5 at 60–62. Pequette then emailed Laura Erickson, a human resources partner at ATI, about the call. He wrote that the school would tell Vincent that day that it did not want her to return, and that Turner "would officially document the request to remove her with valid reasoning and send it over." Doc. 65-27 at 2. Erickson asked if this was the first time "we have heard of these concerns" or if there had been "ongoing issues." *Id.* at 3. Pequette replied: "It's a longer story. But yes on going [sic]." *Id.* at 5.

Near the end of that day, Turner asked Shade to go to Vincent's office to tell her to give up her keys. Shade complied, arriving at Vincent's office that day with other coaching staff to tell her to leave her keys before she left the school. Shortly before Vincent left, she called Pequette and told him "what happened." Doc. 54-3

at 57. According to Vincent, Pequette said on the call that "he was completely unaware and wanted to know what had been going on at Pinson." *Id.* Vincent asked "why three men just came into my office [and] told me to leave my keys," and Pequette responded "to play nice and leave your keys and we'll talk on Monday," June 8, 2020. *Id.* According to Vincent, she also complained to Pequette on that call that she believed her exit had to do with Shade's discomfort working with women. June 5, 2020 was the last day Vincent worked at Pinson Valley.

On June 7, 2020, Dave Bush, a manager at ATI, contacted Shade to let him know that Alex Gee would be "taking over" Vincent's duties the next day. Doc. 54-9 at 15. Bush later averred that he had identified Gee as Blackmon's replacement before he had ever learned Vincent was being removed from Pinson Valley, and that when he learned on June 5 that Vincent would not return to Pinson Valley, he believed the school would have no athletic trainer from ATI at all because "Blackmon's replacement had not yet started." Doc. 54-2 at 3. Later on June 22, 2020, Taylor Cole, a female employee of ATI, also began as an athletic trainer at Pinson Valley. Pequette averred that he had identified Cole as a "replacement to fill the vacancy left open after Pinson Valley removed Vincent[.]" Doc. 54-1 at 7.

On June 8, 2020, Pequette followed up with Turner, asking Turner for further documentation on why he wanted Vincent removed. Turner replied over email that Vincent "created somewhat of a toxic work environment for some of our coaches," made

23-12417                Opinion of the Court                7

"personal comments" about them, and "attempted to assert her 'authority' by giving guidance and directions to coaches that have absolutely nothing to do with her role as an athletic trainer." Doc. 54-5 at 61; 54-8 at 66. Turner stated that he had spoken to Vincent about "her behavior as it relates to her role as an athletic trainer versus attempting to tell coaches how they should do their jobs," but then heard from Shade that Vincent "decided to voice her dissatisfaction with her role as simply [] an athletic trainer" and "went on making derogatory comments about certain coaches." *Id.* Turner testified that the reasons he laid out in this June 8 email were consistent with what he and Pequette had discussed in their June 5 phone call.

That same day, Pequette forwarded Turner's email to Erickson. At his deposition, Pequette admitted that the allegations in Turner's email had not, to his knowledge, ever been documented. Erickson asked Pequette if he had documentation on other issues previously reported to Pequette about Vincent. He replied that some of Vincent's prior issues occurred when ATI was not yet documenting issues in its "Dayforce" system, but that ATI had "removed two different [athletic trainers] from Pinson Valley over the years because [Vincent] could not get along with them or claimed they were not competent [athletic trainers]." Doc. 65-31 at 2. He continued: "We have had issues with [Vincent's] drama and constant complaints and accusations internally and with school employees." *Id.* Erickson replied that this was not enough to terminate Vincent's employment at ATI, but recommended Pequette to

notify Vincent that she could no longer continue at Pinson Valley and to "offer her all open positions within [Alabama]." Doc. 65-32 at 2.

Sometime the week of June 8, Pequette and Vincent spoke on the phone again. Vincent complained to Pequette, as she did earlier on June 5, that she believed the school's removal decision had to do with Shade's discomfort working with women. Pequette responded that she lacked proof and described her complaint as a "he said, she said" situation. Doc. 54-3 at 60.

On June 11, 2020, ATI offered Vincent three new work assignments that she could choose from: (1) a split position between Oakman High School and Carbon Hill High School; (2) a position at Pelham Middle School; and (3) a position at Oak Mountain Middle School. The high-school position offered the same pay, and the middle-school positions offered lower pay and would require Vincent to assist at high school events various days of the week.

According to Pequette, Vincent was offered "all available athletic trainer assignments at central Alabama schools as of the date of the offer"—and "available" assignments included "all known assignments that were not filled by another athletic trainer or offered to another individual." Doc. 54-1 at 5–6. Vincent testified at her deposition, however, that some time before she left Pinson Valley on June 5, an ATI supervisor had told her that there were a few high-school and middle-school positions open, including one at Chelsea High School. An email that Pequette had sent Erickson on June 3, 2020 also contained a list of openings that included more

schools than what ATI offered Vincent on June 11. When asked at his deposition why these positions were not offered to Vincent, Pequette explained that Vincent was offered "all of the open positions at" the time of the offer, that sometimes ATI already had a supervisor or other candidate in mind for an opening but had not yet posted the opening, and that ATI could not offer an employee a job "if a plan is already in place and conversations are en route" to hire someone else. Doc. 54-12 at 49–51.

Vincent did not want to take the split high school assignment, in part because it would require her to cover two high schools instead of one. The middle-school positions, in turn, required a pay cut. But on June 15, 2020, Vincent accepted the position at Pelham Middle School, emailing Erickson and Pequette that she believed her reassignment was sex discrimination and retaliation for her complaints of sex discrimination.

In response, Erickson set up a call between her, Vincent and Pequette. In that call, Erickson told Vincent that Pinson Valley's removal request was not discriminatory or retaliatory, and offered Vincent a severance package with two weeks of continued pay if she did not want to accept the Pelham Middle School position.

Vincent resigned from ATI in July 2020.

*B.*

Vincent filed suit against ATI. Her amended complaint alleged that ATI engaged in sex discrimination (count four) and retaliation (count five) when it removed her from Pinson Valley and

when it assigned her to another school. *See* 42 U.S.C. § 2000e *et seq.* She also brought claims against the Jefferson County Board of Education, Turner, and Shade, but those claims—which were either resolved via joint stipulation or dismissed without prejudice—are not at issue on appeal.

After the close of discovery, ATI filed a motion for summary judgment. The district court granted that motion, concluding that, although a genuine dispute existed as to whether ATI had control over Vincent's removal, Vincent failed to establish that ATI discriminated or retaliated against her, whether in the removal or reassignment. This appeal followed.

## II.

We review *de novo* a grant of summary judgment, affirming that judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1332 (11th Cir. 2023). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.*

## III.

Vincent argues that the district court erred in granting summary judgment for ATI on her discrimination and retaliation claims. We begin by addressing the district court's determination that a genuine dispute existed as to whether ATI had control over Vincent's removal in the first place. We then address Vincent's

claim of discriminatory removal and reassignment. Finally, we address her claim of retaliatory removal and reassignment.

### A.

To assess whether ATI discriminated or retaliated against Vincent by removing her from Pinson Valley, the district court first asked whether ATI had control over her removal at all. It concluded that whether ATI had such control is a genuine issue of disputed fact. We agree with the district court.

### 1.

To start, the parties do not dispute that for Vincent to succeed on her discriminatory and retaliatory removal claims, she needed to establish that ATI had a modicum of control over her removal in the first place. And indeed, a threshold control requirement coheres with Title VII's text and the objective of Vincent's suit.

Vincent's discriminatory removal claim implicates 42 U.S.C. § 2000e-2(a)(1) and 2000e-2(m), and her retaliatory removal claim implicates 42 U.S.C. § 2000e-3(a). Two of these provisions—sections 2000e-2(a)(1) and 2000e-3(a)—prohibit an "employer" from engaging in unlawful action. To decide whether an entity is an employer for Title VII purposes, we have examined "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Peppers v. Cobb County*, 835 F.3d 1289, 1297 (11th Cir. 2016) (internal marks omitted). We examine "(1) how much control the alleged employer exerted on the

12                Opinion of the Court                23-12417

employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Id.*

The third provision, section 2000e-2(m), does not mention "employer," but states that an "unlawful employment practice is established" when a complainant "demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Here, the entity that Vincent seeks to hold liable for a sex-motivated "unlawful employment practice" is ATI. Absent a theory of vicarious liability, which Vincent does not allege, it would make no sense to hold ATI liable for an unlawful employment practice motivated by sex if ATI had no control whatsoever over that practice. In other words, if ATI lacked control over Vincent's removal, we could not say that ATI was *responsible* for removing Vincent or that sex *motivated* ATI to remove her.

2.

We agree with the district court that a genuine dispute exists as to whether ATI had a modicum of control over Vincent's removal from Pinson Valley. ATI contends that it had no such control because Turner instructed ATI to remove Vincent, and because Pinson Valley staff entered Vincent's office to tell her to leave her keys before Turner sent his email to Pequette memorializing his reasons for wanting Vincent removed. So, ATI argues, this case is just like *Llampallas v. Mini-Circuits, Lab, Inc.*, where we held that a non-profit corporation that "made no decisions that affected the

terms and conditions of [a plaintiff's] employment" at another company, could not have been that plaintiff's "employer" for the purposes of her Title VII claim alleging that she had been discriminatorily fired from that company. 163 F.3d 1236, 1244–45 (11th Cir. 1998); *see* 42 U.S.C. § 2000e-2(a)(1).

We disagree. Unlike in *Llampallas*—where the non-profit had "absolutely nothing to do with [the] decision" to terminate the plaintiff, 163 F.3d at 1245—evidence here suggests that ATI had at least some control over Vincent's removal from Pinson Valley. For one, ATI's contract with Pinson Valley provides that ATI "shall remain solely liable for the oversight and performance" of its athletic trainers. Doc. 54-1 at 11 ¶12. Further, Turner testified at his deposition that it was ATI's decision to remove Vincent, because she was ATI's employee and not Pinson Valley's. And Turner's email to Pequette on June 8 ended with Turner "asking" for Vincent to be removed from the school, just as Turner had earlier emailed Pequette "requesting" that Blackmon be removed. Doc. 54-8 at 57, 66. This evidence raises a genuine dispute as to whether ATI's approval was necessary to ultimately remove Vincent from Pinson Valley. Thus, for the purposes of summary judgment, we assume that ATI had control over Vincent's removal and was her employer under Title VII.

*B.*

With that issue behind us, we turn to Vincent's sex discrimination claim. *See* 42 U.S.C. § 2000e-2(a)(1), (m). A plaintiff asserting a Title VII sex discrimination claim can do so in several ways: (1) a

14                    Opinion of the Court                    23-12417

mixed-motive or "motivating factor" theory, *see Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016)[1]; (2) the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)[2]; or (3) a convincing mosaic—simply put, the summary judgment standard itself, *see McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024). Under all three approaches, Vincent argues that a reasonable jury could conclude that ATI discriminated against her based on sex (1) when it removed her from Pinson Valley and (2) when it assigned her to another school.

---

[1] Under *Quigg*'s mixed-motive theory, the employee contends that a discriminatory input, like sex bias, was a motivating factor in an employer's decision, even if other legitimate reasons justified it as well. 814 F.3d at 1241. Under a mixed-motive theory of causation, "the plaintiff is not required to prove that the employer's stated reason for the adverse action was pretextual." *Yelling*, 82 F.4th at 1338 n.3.

[2] Under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of discrimination by showing: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question," *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc), and "(4) [she] was replaced by someone outside the protected class or was treated less favorably than a similarly situated individual outside [her] protected class," *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Lewis*, 918 F.3d at 1221. Once the employer proffers a non-discriminatory reason, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination . . . ." *Lewis*, 918 F.3d at 1221.

23-12417                Opinion of the Court                15

1.

We begin with the removal claim. The parties do not dispute that Vincent's removal from Pinson Valley was an adverse employment action. The question, broadly, is whether sex was a "motivating factor" or the "true reason" behind that removal—or, put another way, whether a jury could reasonably conclude that ATI discriminated against Vincent because of her sex. *See Quigg*, 814 F.3d at 1237, 1239; *McCreight*, 117 F.4th at 1335. The answer is no.

For starters, Vincent's argument for discriminatory removal is not that ATI independently decided to remove her from Pinson Valley because of her sex. Instead, she argues that *Pinson Valley* requested to remove her because of her sex and ATI is liable for honoring that request. The theory is that, even if ATI did not itself harbor discriminatory animus against Vincent, it can nevertheless be liable under Title VII because it "acquiesced to [Pinson Valley's] discriminatory request to have Vincent removed from the school." Appellant's Br. at 24. And a staffing firm acquiesces to a client's discrimination, Vincent suggests, when the firm "knew or should have known" of the client's discrimination yet honored the client's discriminatory request or otherwise failed to take "immediate" or "corrective actions." *See id.* at 17 (stating, without proper attribution, that "[a]n employer may be liable for discriminatory conduct, including retaliation, by non-employees 'where the employer either ratifies or acquiesces in the [conduct] by not taking immediate

and/or corrective actions when it knew or should have known of the conduct.").

Similarly, the Equal Employment Opportunity Commission, which filed an amicus brief, invites us to adopt a liability standard used by at least three other circuits. That standard would hold a staffing firm liable for its client's discrimination if (1) the firm "participates in the client's discrimination," for instance, by honoring a "client's request to remove a worker from a job assignment for a discriminatory reason," or (2) the firm "knows or should have known of the client's discrimination but fails to take corrective measures within its control." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 228–29 (5th Cir. 2015) (citation modified); *see Whitaker v. Milwaukee County*, 772 F.3d 802, 812 (7th Cir. 2014); *EEOC v. Glob. Horizons, Inc.*, 915 F.3d 631, 641 (9th Cir. 2019). *See also* Restatement (First) of Torts § 876 (1939) (a person is liable for harm that another causes a third party to suffer if the person "knows that the other's conduct constitutes a breach of duty and gives substantial assistance . . . to the other so to conduct himself"); *id.* § 877 (stating that a person is liable for harm to a third party if the person "permits [another] to act upon his premises or with his instrumentalities, knowing or having reason to know that the other is acting or will act tortiously"); *Dillon v. AFBIC Dev. Corp.*, 597 F.2d 556, 562 (5th Cir. 1979) (real estate agent was liable under the Fair Housing Act for his "participation" in a homeowner's racially motivated refusal of a purchase offer, when the agent "knew" the refusal was racially motivated).

Although Vincent and the EEOC argue that ATI is liable under this standard, we disagree. We need not decide today whether to follow these other circuits. Instead, we will assume without deciding that Vincent and the EEOC are correct that a staffing firm cannot honor a client's request that the firm knows or should know is discriminatory. But, even entertaining this assumption, we believe Vincent's discriminatory removal claim fails because no reasonable jury could conclude that ATI knew or should have known that Vincent's sex was why Pinson Valley asked that she be removed.

Vincent's claim fails because there is no evidence that Turner told or suggested to Pequette that he wanted Vincent removed from the school because of her sex. Instead, when Pequette asked Turner for documentation explaining why Turner wanted Vincent removed, Turner wrote that Vincent had created a "toxic work environment" for some of the coaches by making "personal comments" about them; that she had attempted to give directions to coaches in a way that exceeded her role as an athletic trainer; and that Shade had told him that Vincent made derogatory comments about other coaches. Doc. 54-8 at 66. These reasons, Turner testified at his deposition, were consistent with what he and Pequette had discussed in their phone call a few days earlier. None of these reasons suggested to Pequette that Vincent's sex had motivated Turner's request for her removal.

In response, Vincent makes three arguments, but none works.

First, she points to evidence that she suggests establishes that ATI knew it was being asked to remove her from Pinson Valley because of her sex. Specifically, Vincent says that (1) ATI replaced her with Alex Gee, a male coach; (2) Pequette, when asked at his deposition how he would respond if Turner said he did not want any black athletic trainers, replied that this was "not how ATI operates"—suggesting, in Vincent's view, that ATI could identify discriminatory requests but cared more about race discrimination than sex discrimination; and (3) when asked at his deposition what he did in response to Vincent's complaint about discrimination, Pequette testified that "one of the things we did was keep her at ATI and offer her a position outside of an environment that was clearly not working on either side, by the school or for [Vincent]." Appellant's Br. at 22–24; Doc. 54-12 at 21–24. We disagree that these facts could establish actual knowledge on the part of ATI. Pequette's testimony at his deposition suggests nothing at all about his knowledge of why Pinson Valley requested that Vincent be removed; he was testifying about ATI's non-discrimination policy and about ATI's effort to accommodate Pinson Valley's request without terminating Vincent's employment at ATI. It is true that Gee, a male athletic trainer, started at ATI shortly after Vincent was removed, but he filled a vacancy left by Blackmon, another male trainer. And, only a few weeks after Vincent left Pinson Valley, ATI assigned Cole, a female, to the school as the second (out of two) athletic trainers.

Second, Vincent suggests that ATI *should* have known it was participating in discrimination because it should have discounted

the reasons that Pinson Valley gave for wanting her removed. Specifically, Vincent says that: (1) she complained to Pequette that she thought her removal had to do with Shade's discomfort working with women; and (2) Pinson Valley's reasons for requesting her removal were suspicious because, for example, Pinson Valley had issues with Vincent's work performance only after it hired Shade and ATI had not previously documented any workplace issues stemming from Vincent's fault. We disagree. ATI's documents have no bearing on the credibility of Pinson Valley's non-sex-based reasons for requesting Vincent's removal. And those reasons—which included her attempts to instruct coaches in ways that exceeded her authority, and which arguably echoed Pequette's own recollection of Vincent's issues with Woodard and Blackmon—were not belied by the timing of Pinson Valley's removal request. To doubt these reasons, Pequette would need to accept—on the basis of Vincent's uncorroborated allegation that Shade was uncomfortable working with women—that Shade was actually uncomfortable in this way, that Shade's supposed sex discrimination motivated him to complain about Vincent to Turner, and that this discriminatory purpose ultimately played a role in Turner requesting Vincent's removal. It may be, as Vincent says, that Shade was motivated by sexism, *and* his sexism carried through to Turner, *and* Pinson's Valley's non-sex-based reasons for asking for Vincent's removal were pretextual, but we cannot say that a reasonable person in Pequette's position should have known of this motivation based on the information he had.

Third, Vincent says that ATI cannot avoid liability because it did not do more to investigate Pinson Valley's motivations in light of her allegations. We disagree. Even assuming, again, that a staffing firm could be liable under Title VII for knowingly assisting a client's discrimination, that liability standard would not impose a standalone burden on the firm to investigate the client's purported discrimination. In other words, even under that standard, if nothing establishes that a staffing firm knew or should have known of a client's discrimination, the firm cannot nonetheless be liable just because it did not investigate the slightest allegation of discrimination at the client site. Title VII prohibits an employer from discriminating; it does not impose a freestanding obligation on staffing firms to formally investigate the motivations of their clients. *Cf. Llampallas*, 163 F.3d at 1250 ("We hesitate to require an employer to investigate . . . every action of its employees that could be motivated by a discriminatory animus."). Nor does Title VII give a staffing firm special tools to conduct a formal investigation into another entity's reasons for making a request. And, neither Vincent nor the EEOC has explained how such an investigation should end—for example, how ATI should ultimately adjudicate Vincent's allegations about Pinson Valley's motivations.

Vincent's unsubstantiated comments about Shade's alleged discomfort working with women did not create an obligation under Title VII for ATI to launch an investigation of Pinson Valley. We reject the premise that, to lack constructive knowledge of discrimination, a staffing firm must itself dig up all the potential evidence around its client's rationale for making a request. That

premise would shoehorn into the concept of constructive knowledge, investigative duties that Title VII does not impose. Here, Pequette finalized Vincent's removal after requesting and receiving from Turner nondiscriminatory written reasons for removal that were not undermined by Vincent's comments and that matched what Turner explained on an earlier phone call. On these facts, we cannot say that ATI knowingly assisted a discriminatory action.

For these reasons, Vincent's discriminatory removal claim fails, whether on a mixed-motive or convincing-mosaic approach, or on the *McDonnell Douglas* framework, which we assume without deciding that Vincent can raise on appeal despite not arguing it below. *Cf. Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1312 (11th Cir. 2023) (plaintiff could bring convincing-mosaic arguments despite not raising them below, because parties forfeit issues and not "individual arguments" and plaintiff preserved the issue by arguing that the evidence "raise[d] a reasonable inference of retaliation"). *But see McCreight*, 117 F.4th at 1332-33 (explaining that, "a plaintiff wishing to prevail on a particular theory of liability must present that argument to the district court" and rejecting a *Quigg* mixed-motive theory of liability raised for the first time on appeal). As for mixed-motive analysis and a convincing mosaic, Vincent has not established that sex was a reason or "motivating factor" in ATI's decision to ultimately remove her from Pinson Valley. *See Quigg*, 814 F.3d at 1239; *McCreight*, 117 F.4th at 1335. Likewise, because nothing suggests that Pinson Valley's removal request was facially discriminatory or that ATI otherwise knew or should have known

it was based on sex, the second and third steps of the *McDonnell Douglas* framework resolve in ATI's favor: honoring the school's request was not an illegitimate reason for removal, *see Lewis v. City of Union City*, 918 F.3d 1213, 1221 (11th Cir. 2019) (en banc) (requiring defendant to offer a "legitimate, non-discriminatory reason for its actions" to shift burden back to plaintiff); and sex—which was not even *a* reason for removal—was not "the true reason" for her removal either, *see Quigg*, 814 F.3d at 1237 (explaining what a plaintiff must prove to establish pretext at the third and last stage of the *McDonnell Douglas* framework).

2.

We now turn to Vincent's argument that ATI's assignment of Vincent to another school was discriminatory. That argument also fails, whether under a mixed-motive, *McDonnell Douglas*, or convincing-mosaic approach, assuming again that Vincent can rely on all three approaches on appeal.

As an initial matter, both the mixed-motive and *McDonnell Douglas* frameworks require a plaintiff to establish that she suffered an "adverse employment action." *Quigg*, 814 F.3d at 1225; *Lewis*, 918 F.3d at 1220; *see Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (explaining that to establish adverse action on a Title VII discriminatory forced-transfer claim, a transferee need only establish that she was "treat[ed] worse" on her employment terms or conditions). Here, we assume without deciding that Vincent suffered an adverse employment action through her transfer to Pelham Middle

School, the school she chose among the three reassignment options that ATI offered her.

But even so, her discriminatory transfer claim fails because no reasonable jury could conclude that ATI treated her adversely—that is, offered Vincent reassignment options worse than her job at Pinson Valley—"because of" her sex or with sex as a "motivating factor" or the "true reason." *See Quigg*, 814 F.3d at 1237, 1239; *McCreight*, 117 F.4th at 1335. Vincent argues that sex played a role in ATI's offer of worse positions because: (1) Vincent was not offered positions open at other schools; (2) the pay at the middle-school positions was less than the pay at her Pinson Valley position even though ATI's pay scale made no distinction between middle-school and high-school positions; (3) at the position she ultimately chose—the one at Pelham Middle School—she still needed to work sometimes at a high school; (4) when Blackmon was removed after Vincent reported concerns about him, his pay did not change and he split his time covering smaller schools; and (5) after Vincent complained to Pequette and Erickson about her treatment at Pinson Valley, they did not ask her further questions about her complaints but instead told her to "move forward" and not be "angry and upset." Appellant's Br. at 25–27.

These reasons fail to establish that sex-based discrimination played a role in the reassignment process. First, although Vincent mentions other open positions, she has not established that those positions—which the record suggests were open around June 3, 2020—were open when ATI offered her reassignment options on

June 11. Nor has she established, more importantly, that Pequette's failure to offer those supposedly open positions had anything to do with Vincent's sex. Second, even if the pay scale Vincent points to did not differentiate between middle-school and high-school pay, the middle-school positions she was offered still fell within the pay range listed in the scale Vincent referenced, and Vincent was offered a high-school position with the same pay as her pay at Pinson Valley. Third, Vincent has not demonstrated that her sex was a reason why she needed to split work between high school and middle school at her Pelham Middle School position. Fourth, even if Blackmon's pay did not change and his new assignment involved smaller schools, Vincent was also offered a position with the same pay as her previous position. Lastly, Pequette and Erickson's comments that Vincent "move forward" without anger after she complained about her treatment at Pinson Valley, have nothing to do with whether sex was a reason why the positions they offered her were worse than her position at Pinson Valley.

Thus, we reject Vincent's claim that she suffered sex discrimination in the reassignment process. As explained above, nothing suggests that sex was a reason or motivating factor in ATI's reassignment offer, so Vincent's claim fails under a mixed-motive analysis and a convincing mosaic. *See Quigg*, 814 F.3d at 1239; *McCreight*, 117 F.4th at 1335. Likewise, her claim falters at the second and third steps of the *McDonnell Douglas* framework: ATI explained that it offered the options it did because only those options were open in the area at the time, and nothing about that reason is illegitimate or discriminatory, *see Lewis*, 918 F.3d at 1221; and,

because Vincent could not demonstrate that sex was *a* reason behind her reassignment, she has not demonstrated that sex was "the true reason" either, *see Quigg*, 814 F.3d at 1237.

### C.

We now address Vincent's retaliation claim—which, unlike her discrimination claim, does not allege that ATI acquiesced to another entity's unlawful decision, but alleges that ATI treated her worse because she engaged in protected activity.

Title VII prohibits an "employer" from retaliating against any employee engaged in statutorily protected activity. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (internal marks omitted); 42 U.S.C. § 2000e-3(a). Here, Vincent can argue her retaliation claim using the *McDonnell Douglas* framework or a convincing mosaic. *See Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021). But, "it is well-established that the mixed-motive framework does not apply to Title VII retaliation claims"—instead, Vincent must prove that her "protected activity was a but-for cause of the alleged adverse action." *Yelling*, 82 F.4th at 1338 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). So as an initial matter, to the extent Vincent argues Title VII retaliation based on a mixed-motive theory, we reject that argument upfront.

We turn first to Vincent's *McDonnell Douglas* retaliation argument, and second to her convincing-mosaic argument.

1.

Under the *McDonnell Douglas* framework, a Title VII retaliation claim involves three burdens. First, an employee must establish a prima facie case of retaliation by proving that she (1) engaged in statutorily protected conduct and (2) suffered an adverse employment action; and (3) a causal relation exists between the two events. *Berry*, 84 F.4th at 1307. Second, if the employee establishes a prima facie case, the burden of production shifts to the employer, who must then proffer a "legitimate, nonretaliatory reason" for the adverse action. *Id.* (quoting *Tolar*, 997 F.3d at 1289). Third, if the employer proffers such a reason, the employee must prove that the reason was pretext for retaliation. *Id.*

i.

To make out a prima facie case of retaliation, Vincent must first point to statutorily protected conduct—that is, whether she "opposed any practice made an unlawful employment practice by" Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. *See* 42 U.S.C. § 2000e-3(a). Protected activity includes not only filing formal EEOC complaints, but also "informally voic[ing] complaints to [one's] superiors" or using an employer's "internal grievance procedures." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (internal marks omitted).

Here, the parties do not dispute that Vincent engaged in protected activity by complaining to Pequette about the sex

discrimination she allegedly experienced in relation to Shade. But to the extent Vincent says her previous complaints against *Woodard* and *Blackmon* constituted protected activity, that argument falls short. In her principal brief, Vincent explains that she reported Woodard for "allowing male athletes to engage in simulating sex acts." Appellant's Br. at 40. That does not establish that she was opposing an employment practice that was unlawful under Title VII, or that she was participating in a Title VII proceeding or investigation: even if Woodard let students talk inappropriately about sex, nothing suggests that Vincent reported on Woodard for harassing or discriminating against her or other students on the basis of sex or any other Title VII characteristic. Likewise, nothing in the record suggests that Vincent's complaint against Blackmon for failing to do his job adequately—including, for example, by failing to bring certain medical equipment to athlete training—is the kind of reporting activity protected by Title VII. So, the only protected activity we examine for the purposes of Vincent's retaliation claim are her complaints to Pequette about the sex discrimination she allegedly suffered in relation to Shade.

As the second piece of her prima facie case, Vincent must establish that she suffered an adverse employment action. In the retaliation context, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Vincent argues that her removal from Pinson Valley and her reassignment to another

school were adverse employment actions. ATI does not dispute that Vincent's removal was adverse, but says that her reassignment was not. We assume without deciding that both Vincent's removal and reassignment were adverse, because as explained below, her retaliation claim nonetheless fails.

Third, Vincent must establish causation. At the prima facie stage, the causation element is construed broadly enough that a plaintiff need only establish that "the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir. 1993). "Close temporal proximity between the protected activity and the adverse action may be sufficient" to demonstrate that connection. *Shannon*, 292 F.3d at 716–17 (internal marks omitted). Here, Vincent has established that her complaint to Pequette about alleged sex discrimination in relation to Shade, and her removal and reassignment, are not completely unrelated.

We begin with removal. To start, the parties dispute when Vincent complained to Pequette: ATI says Vincent did so on June 5 or June 8, 2020, only *after* Pinson Valley staff entered her office and told her to leave her keys on June 5; Vincent says there is evidence suggesting that she complained to Pequette even before she exited the school on June 5. But Vincent's exit from Pinson Valley on June 5 is not the dispositive moment for purposes of assessing when *ATI* removed Vincent. Although Vincent's physical exit marked her last moment working at Pinson Valley, the record—construed in the light most favorable to Vincent—suggests that

ATI had not finally approved of Vincent's removal by then. That's because on June 8, 2020, Pequette asked Turner to email reasons as to why Turner wanted Vincent removed; Turner replied with those reasons and ended his email asking for Vincent to be removed; and Pequette sent Turner's email to Erickson who then recommended that Pequette notify Vincent she could not continue at Pinson Valley.

So for summary judgment purposes, we treat Vincent's removal as having taken place on June 8, 2020 or shortly after. The causation inquiry is then straightforward. Vincent complained to Pequette about alleged sex discrimination either on June 5, June 8, or both, and ATI finalized its removal around June 8 or shortly after. The temporal proximity between her complaints and her removal is enough to establish that the two things were not completely unrelated. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (one month between plaintiff's complaint and discharge was enough to establish causation at the prima facie stage).

Likewise, the temporal proximity between Vincent's complaints on June 5 or June 8, and her reassignment to Pelham Middle School on June 11, also establishes prima facie causation between her protected activity and reassignment.

ii.

Because Vincent has made out a prima facie case, the burden shifts to ATI to proffer legitimate, nonretaliatory reasons for her removal and reassignment. At this stage, ATI's burden is "exceedingly light"—ATI need not persuade us that it was *actually*

motivated by its proffered reasons. *Yelling*, 82 F.4th at 1340 (internal marks omitted). It need only "articulat[e] a legitimate reason—rather than remaining 'silent in the face of the presumption' that follows a prima facie showing." *Id.* ATI has satisfied that burden. As explained above, the reason ATI gave for removing Vincent from Pinson Valley is that it sought to honor Turner's request to remove her, and the reason ATI gave for offering the reassignment positions it did was that those were the positions open in the area at the time of the offer.

iii.

The burden finally shifts to Vincent to point to "evidence sufficient to allow a reasonable inference of pretext and that her protected conduct was a but-for cause." *Id.* at 1341. Vincent need not prove that retaliatory animus was the *only* but-for cause behind ATI's activity: an outcome can have multiple but-for causes. *See id.* at 1339. Still, a but-for cause is a cause that, if removed, "would change the outcome." *Id.* Vincent's retaliation claim fails at this step: she has not established that her complaints to Pequette formed a but-for cause for either her removal or reassignment.

As for removal, Vincent argues her complaints to Pequette were a but-for cause because: (1) the complaints and removal were close in time; (2) ATI had almost removed her from Pinson Valley when she reported on Woodard's behavior in 2017 but then declined to do so after she objected that she was being retaliated against; and (3) when Erickson requested documentation from Pequette to support Vincent's removal, Pequette responded that

ATI had issues with Vincent's "drama and constant complaints and accusations internally and with school employees," even though at his deposition, the only issues he could point to were Vincent's justified reports on Blackmon and Woodard. Appellant's Br. at 39–41.

These reasons fail to establish but-for causation: they do not establish that had Vincent *not* complained to Pequette about alleged sex discrimination in relation to Shade, ATI would *not* have removed her from Pinson Valley. ATI provided evidence that it removed Vincent to follow Turner's request, and none of Vincent's reasons prove that but for Vincent's complaints to Pequette about Shade, Pequette would not have honored that request. *See Gogel*, 967 F.3d at 1136 ("it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her"). Nor has Vincent made any argument that Turner's removal request was itself retaliatory. Further, the temporal proximity between her complaints to Pequette and her removal can be easily explained by the fact that Turner requested Vincent's removal close to when she complained to Pequette. And, even if Vincent was justified in the conflicts she had with Woodard and Blackmon, that says nothing about whether Pequette removed Vincent because of her complaint about Shade later on. At best, the evidence might suggest that Pequette removed Vincent from Pinson Valley in part because of her past complaints on Woodard and Blackmon, but as explained above, Vincent has not established that *those* complaints were protected activities within the meaning of Title VII.

Similarly, Vincent has not demonstrated that her complaint about alleged sex discrimination in relation to Shade was a but-for cause behind ATI's offer of positions worse than her position at Pinson Valley. ATI explained that it offered the positions it did because those were the only ones open at the time of the offer. To argue pretext, Vincent appears to raise the same three points she gave for why ATI's reason for her removal was pretext. Two of those points—her near-removal in 2017, and Pequette's email to Erickson about Vincent's previous issues with Woodard and Blackmon—have little if anything to do with whether Vincent's complaints about Shade in June 2020 caused ATI to offer the positions it did. The third point—temporal proximity between her later complaints and her reassignment—can be readily explained by the fact that right around when Vincent complained about Shade, she also left her position at Pinson Valley, creating a need for ATI to assign her to another place shortly after. Lastly, to the extent Vincent argues that positions open on June 11, 2020 were not offered—a proposition that, as discussed above, is tenuous at best—she has not pointed to any evidence suggesting that a but-for reason why those options were not offered is that Vincent had complained to Pequette about Shade. In sum, she has not established that had she not so complained to Pequette, she would have been offered anything different.

2.

We turn finally to Vincent's argument for retaliation under a convincing mosaic. That mosaic is simply a metaphor for the

legal standard for summary judgment—whether the evidence "raises a reasonable inference of retaliatory intent." *Berry*, 84 F.4th at 1310. Evidence of that intent can include "(1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342.

Here, Vincent argues there was a convincing mosaic of retaliatory intent by pointing to (1) the same evidence she used to argue pretext under *McDonnell Douglas*; (2) the same evidence she used to argue that ATI removed and reassigned her with discriminatory intent; and (3) the fact that ATI failed to investigate her complaints, that Pequette and Erickson told her after her removal to not be upset and to move on, and that ATI offered her two weeks of severance pay if she wanted to leave ATI.

These reasons all fail to paint a picture that ATI retaliated against Vincent for complaining to Pequette about alleged sex discrimination in relation to Shade. First, as explained above, Vincent has not established that ATI's reasons for removing her (honoring Turner's request) and offering her the positions it did (those were the only ones open) were pretextual. Second, as discussed above, she has not provided enough evidence for a jury to conclude that ATI's removal or reassignment was discriminatory. And, even if she did, whether ATI treated her worse because of her sex is a question separate from whether ATI treated her worse because she complained about sex discrimination. Finally, Vincent has not explained how the specific points she raises—ATI's failure to

investigate her complaints about Shade, Pequette and Erickson's comments encouraging her to move on, and ATI's offer of severance pay—have anything to do with whether ATI removed or reassigned her *because* she complained to Pequette about Shade.

## IV.

We **AFFIRM** the district court.